# Richmond

## E. I. duPont deNemours & Company v. Universal Moulded Products Corporation.

November 27, 1950.

Record No. 3663.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Stant & Roberts, Abel Klaw, Woods, Rogers, Muse & Walker* and *W. Breckenridge De Riemer*, for the plaintiff in error.

*Jones, Woodward & Miles, Reed, Crane & McGovern* and *Martin J. Coughlin*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This is a proceeding by notice of motion for judgment instituted on January 2, 1948, by Universal Moulded Products Corporation, hereinafter referred to as plaintiff or Universal, against E. I. duPont de Nemours & Company, hereinafter referred to as defendant or duPont, to recover $650,000 damages alleged to have been sustained as a result of improper and defective paint materials furnished by duPont to Universal, for use by the latter in finishing wooden radio cabinets in its plant at Bristol, Virginia.

The notice of motion, containing five counts, alleged that duPont, with knowledge of the requirements of Universal, furnished paint materials to the latter with an express warranty of uniformity and an implied warranty of fitness; that contrary to its warranties the materials were defective, producing on the surface of the finished cabinets blemishes which made them unsalable; that duPont made fraudulent misrepresentations with respect to such materials, fraudulently concealed changes in their ingredients, and was negligent in their manufacture; and that during June, July, August and September of 1947 and the three months following

Universal suffered a loss of $650,000, because of the expense of correcting defects in the finish of cabinets, occasioned by the unfitness of duPont's finishing materials and systems, and in the consequent slow-down and interruption of the normal operation of its plant, all of which was the reasonably foreseeable and probable result of the faults attributed to duPont. The damage claim was later amended by leave of court to $666,561.40.

Defendant demurred to the notice of motion upon eight separate grounds, the principal ground being for misjoinder of causes of action, in that one count of the notice was based upon breach of warranty, two upon tort, and another upon negligence. The demurrer was overruled.

Universal filed a bill of particulars, thirty-four pages in length, containing six printed tables. It set out that for the months of June, July, August and September, 1947, the number of cabinets rejected by its inspection department as not satisfactory in finish was estimated to be 3,131. It admitted that no complete and accurate record of such finish failures was kept, but said it thought that the number rejected was larger than that named. So far as it related to damages, the bill set out a copy of an invoice rendered to duPont on August 23, 1947, in the amount of $65,208.04 for losses alleged to have occurred between June 13th and June 30th, 1947. In a tabulation of an analysis of the operations of Universal from July 1, 1947, to December 31, 1947, under columnar headings, were shown the breakdown of production costs and expenses, administrative expenses, other income, profit on sale of fixed assets, net production costs and expenses, the actual sales, and the losses for the period. According to the tabulation, Universal charged itself with the loss of $170,988.18 on account of the manufacture and sale of a Bendix cabinet, Model BW-81C, and various other direct and miscellaneous expenses not attributable to duPont. The balance of the losses for the period, amounting to $650,396.29, was charged against duPont.

duPont filed twenty-six grounds of defense, nine of which

related to damages. It denied that it had made any warranties to Universal or its customers prior or subsequent to 1947, other than such as might have been implied by law, or made any false representations, or committed any act of negligence, or that any warranties were breached. duPont denied responsibility for anything except uniformity of its products. It alleged that the finishing failures complained of were the natural result of improper application and defective workmanship. It asserted that it merely sold matched colors and finishes, and advised Universal how the desired color and finish could be obtained, but that Universial disregarded its advice. It denied that the damages sued for were foreseeable or the proximate result of any act, neglect, or warranty of duPont. It alleged that the loss, damage and expenses claimed by Universal resulted from Universal's own defective construction and workmanship of cabinets, and were so substantial a part of the total loss and damages sustained as to make it too uncertain and speculative what part should be assessed against duPont, if duPont was responsible for any portion of it.

On March 23, 1949, after a consideration of the evidence and instructions of the court, the jury returned a verdict in favor of Universal for $561,959.06.

On May 4, 1949, after refusal of the trial court to set aside the verdict, final judgment was entered accordingly. To that judgment this writ of error was granted.

The defendant assigns a multiplicity of errors. They relate to the refusal of the court to sustain its demurrer for misjoinder of causes of action; to the admissibility of evidence; to the sufficiency of the evidence to support the verdict; to the giving and refusing of instructions; and to the method of proof of damages. Other assignments relate to the competency of witnesses, to the badgering of witnesses by counsel for plaintiff, and to numerous miscellaneous rulings by the court.

The main issues, as we see them, may be resolved into the following four questions:

(1)   Whether there was a misjoinder of actions in the notice of motion.

(2)   Whether there was an implied warranty of fitness and a breach of that warranty.

(3)   Whether the evidence was admissible and adequate to establish the loss ascertained by the jury.

(4)   Whether the court instructed the jury as to the proper method of proving and measuring damages.

Although the contention of duPont that there was a misjoinder of causes of action in the notice of motion is argued at some length in its brief, it was not pressed in the oral argument.   Originally, actions for breach of warranty were tort actions.   In 4 Am. Jur., Assumpsit, section 15, page 504, this is said:

"For some four hundred years from the first recorded instance of an action for the breach of a warranty in the sale of a chattel, the exclusive remedy was by an action on the case for deceit.   Liability for the breach of a warranty thus appears to have been conceived as purely in tort."

In Virginia, the distinction between common law forms of actions has largely disappeared since the adoption of our notice of motion statute.   Virginia Code, 1950, sec. 8-717.   In the interpretation of that statute we have adopted a liberality of procedure.   *Felvey* v. *Shaffer*, 186 Va. 419, 42 S. E. (2d) 860; *Sanford* v. *Ware, ante*, p. 43, 60 S. E. (2d) 10.

In *Trice* v. *Cockran*, 8 Gratt. (49 Va.) 442, 450, 56 Am. Dec. 151, this court said:

"The action of trespass on the case, is a proper remedy for the breach of an express warranty of soundness of a slave, or other personal chattel sold, as much so as the action of assumpsit, with which it is a concurrent remedy, and the party aggrieved may elect between them.   In both forms of action, the gravamen is the breach of the warranty, which in the former is treated as a tort, with the appropriate language in declaring for a tort, but a scienter or knowledge of the defendant of unsoundness is immaterial, and need not

be alleged in the declaration, nor if alleged need it be proved."

In *Standard Paint Co.* v. *Vietor,* 120 Va. 595, 91 S. E. 752, the plaintiff was allowed to join counts for deceit and breach of warranty in the same action. There Judge Prentis said:

"The gist of the courts in that case (referring to *Harvey* v. *Skipwith,* 16 Gratt. (57 Va.) 393), as in this, is the same. Here the action is based upon a breach of warranty, and, while the complainant may, if he chooses, waive the tort and sue upon contract, he is equally at liberty, where there is a breach of warranty, to sue in tort; and this is what the vendee did in this case.

\* \* \* \* \* \*

"From the institution of this action, the cause of the controversy was clearly and distinctly understood by both parties to it. It was the subject of numerous interviews between them and of voluminous correspondence, and the case made by the amendments was the same case referred to in the declaration, namely, the breach of the vendor's warranty as to the roofing material referred to. It would seem clear that it was the duty of the vendee to join all his causes of action in one declaration, but certainly, if it was not his duty, it was his right to do so.

"In 23 Cyc. 395, this is said: 'As a general rule it may be stated, that a plaintiff may join all his causes of action in one declaration, if in separate suits he can recover on each in the same form of action, although the several causes of action are distinct rights of action so that a judgment in one will not bar a recovery for the other. This rule is, however, subject to the qualification that the causes of action must be in the same right.' This statement of the law is well supported by the authorities there cited.

"In this case, if the vendee had vexed the vendor with several suits, he would have been the subject of criticism. Even where the torts are distinct and independent, if they are of the same nature and if the same

judgment may be given in each, they may, as a general rule, be joined. 23 Cyc. 398; *Fisher* v. *Seaboard Air Line R. Co.*, 102 Va. 363, 371, 46 S. E. 381, 1 Ann. Cas. 622. Here, the torts complained of grew out of a continuous course of dealing between the same parties with reference to one article of commerce, the roofing, and its application to the factory and warehouses of the vendee.

\* \* \* \* \* \*

"And in *Schuchardt* v. *Allen*, 1 Wall. (68 U. S.) 359, 360, 17 L. ed. 642, 645, this is stated: 'The ancient remedy for a false warranty was an action on the case sounding in tort. *Stuart* v. *Wilkins* (1 Douglas 18); *Williamson* v. *Allison* (2 East, 447). The remedy by assumpsit is comparatively of modern introduction. In *Williamson* v. *Allison*, Lord Ellenborough said it had "not prevailed generally above forty years." In *Stuart* v. *Wilkins*, Lord Mansfield regarded it as a novelty, and hesitated to give it the sanction of his authority. It is now well settled, both in English and American jurisprudence, that either mode of procedure may be adopted.' "

See also, *Gerst* v. *Jones*, 32 Gratt. (73 Va.) 518, 34 Am. Rep. 773; *Boyles* v. *Overby*, 11 Gratt. (52 Va.) 202; and *Birmingham* v. *Chesapeake, etc., R. Co.*, 98 Va. 548, 37 S. E. 17.

In 4 Williston, Contracts (Rev. Ed.), section 970, pages 2689, 2690, it is said:

"\* \* \* The law of warranty is older by a century than special assumpsit, and the action on the case on a warranty was in part the foundation of the action of assumpsit. An action on a warranty was regarded for centuries as an action of deceit, and it was not until 1778 that the first reported decision occurs of an action in assumpsit on a warranty. And it is still generally possible where a distinction of procedure is observed between actions of tort and of contract to frame the declaration for breach of warranty in tort. It is probable that today most persons instinctively think of a warranty as necessarily a contract or promise, but

though frequently warranties are true promises and contracts, in other cases they are merely representations which induce a sale, and it is said that if a promise or contract is implied from such representation, the implication is one of law and not of fact. It may be added that the whole law of implied warranty both of title and of quality is based on implied representations rather than on promises."

In 1 Williston, Sales (Rev. Ed.), section 195, page 502, the author says:

"It is probable that today most persons instinctively think of a warranty as a contract or promise; but it is believed that the original character of the action cannot safely be lost sight of, and that the seller's liability upon a warranty may sound in tort as well as in contract."

Expressions in the cases of *Colonna* v. *Rosedale Dairy Co.*, 166 Va. 314, 186 S. E. 94, and *Kroger Grocery, etc., Co.* v. *Dunn*, 181 Va. 390, 25 S. E. (2d) 254, relied on by the defendant to sustain its contention that there was a misjoinder of counts, are purely dicta and contrary to previous Virginia decisions. In the *Colonna Case, supra*, the question of misjoinder was not before this court.

In the *Kroger Case, supra*, there was a joinder in action of contract and tort claims. A demurrer was interposed but was overruled by the trial court. That court later struck the allegation of negligence from the notice and directed the jury there was no evidence to sustain it. It was agreed by counsel for the parties that the defendant was not prejudiced by the trial court's action and the question of misjoinder was not in issue before this court.

See also, *Schuler* v. *Union News Co.*, 295 Mass. 350, 4 N.E. (2d) 465, where the Massachusetts Supreme Judicial Court held that a count for a breach of warranty was properly included in a declaration in an action of tort, citing numerous cases and authorities in support.

Here, the demands of the plaintiff are of the same nature and closely related. Each arose out of the same gen-

eral cause of action, in a continuous course of dealing with reference to one subject, and one judgment may be given.

The evidence is voluminous. It fills seven printed volumes, containing 3,000 pages of testimony and extensive arguments of counsel in connection therewith. Another volume of 212 printed pages, lists 125 exhibits for plaintiff and 56 for duPont. While some of the documentary exhibits are printed, many others are certified as originals by reason of their great length. Because of the numerous questions raised and the great mass of evidence, it is necessary to summarize both the issues and the evidence within the practical limits of an opinion. In doing this we have considered the entire testimony of the witnesses, not their isolated statements, and where the oral testimony was vague and founded on memory or based on inferences, we have looked to unimpeached contemporary records.

Prior to 1945, Universal was engaged exclusively in operating a war plant producing airplane parts, life belts, parts for the atom bomb, and other war material for the United States armed services. In August of that year, after the conclusion of World War II, it decided to convert its plant to the manufacture of wooden radio cabinets. Shortly thereafter a representative of duPont called on Universal and offered it duPont finishing materials which would meet the specifications for such finish as Universal's prospective customer, Bendix Aviation Corporation, might require, particularly including durability of finish. Its representatives likewise conferred with Bendix with respect to its requirements. Agents of duPont visited Universal's plant, observed the layout of the plant, and made suggestions to Universal for methods and manner of procedure in its operations. With the approval of Bendix, duPont was selected by Universal to furnish its complete line of finishing materials.

duPont manufactures, deals in, and offers for sale its own brands of various kinds of fillers, varnishes, washcoats, sealers, stains and lacquers, and other materials used in the complete system or process for finishing cabinets of wood.

It maintains experimental laboratories and technical personnel for developmental and research work upon finishing materials for wood and for testing such materials. Its agents familiarized themselves with the operating conditions in Universal's plant and were informed by the latter of its needs and purposes. duPont's agents represented to Universal and Bendix that their company was competent to make finishing materials for the particular uses required, to prescribe the processes of application, and to test materials and direct processes in order to determine that the materials would produce, under the operating conditions in Universal's plant, a finish equal in all respects to sample cabinets submitted by Universal's customers.

duPont prescribed for Universal the drying times of the products, how long they should dry before they were rubbed, the order in which the coats were to be applied and the code numbers of products to be used in each stage of the finishing process, which numbers were stenciled on the containers of the material. When a new cabinet model was to be produced for a customer of Universal, duPont made sample runs which were submitted to the customer for its approval of the finish. After such approval, duPont submitted to Universal a written finishing process for the cabinet, which process was relied upon by Universal. duPont gave advice and suggestions from time to time and furnished servicemen and technical personnel to assist in solving any difficulties arising during the finishing operations. It assisted Universal in filling out orders for the quantities and kinds of finishing materials necessary for the latter's production, and had access to Universal's stock of supplies to ascertain the extent of replenishment needed. Universal had no knowledge of the ingredients in the materials.

Bendix was the only customer of Universal for radio cabinets between December 1, 1945, and February 1, 1947. During that period, Universal had leased a portion of its plant to Bendix, and it was operated under the supervision of Universal with the latter's operating and management per-

sonnel. Working in close cooperation with the assistance and advice of the representatives of duPont, a large number of cabinets were satisfactorily completed under the Bendix specifications with duPont materials.

On February 1, 1947, the lease agreement between Universal and Bendix was terminated, and thereafter Universal went into the competitive market for the mass production of radio cabinets on its own account.

During the period in controversy, Universal entered into contracts to make various models for Bendix at fixed prices, as set out below:

Order of February 5, 1947, for 5,000 BW-71 cabinets, the first 3,000 at $58.25 and the last 2,000 at $50.75.

Order of February 27, 1947, for 15,000 BW-71 cabinets at $50.75, later modified to 10,000 mahogany BW-71 at $50.75 and 5,000 walnut BW-71 at $47.25.

Order of February 27, 1947, for 10,000 BW-81-C step-table models, the first 3,000 at $29.08 and the last 7,000 at $23.56.

Universal also obtained orders from other radio manufacturers, at the prices shown below:

Olympic Radio and Television Corporation, hereinafter referred to as Olympic, on March 12, 1947, for 5,000 CA-846 model cabinets at $54.38 and on the same date 10,000 CA-847 model cabinets at $60.12. Only a few samples of the latter model were manufactured during the period in controversy.

Westinghouse Electric Corporation, hereinafter referred to as Westinghouse, 10,000 model H-166 cabinets (none alleged to have peeled), at $66.31 on April 16, 1947, and 7,500 model H-169 cabinets, not involved in the controversy, at $97.00 on May 14, 1947.

The procedure for finishing cabinets required nineteen or more steps. The radio cabinets in "whitewood" were completely assembled and brought to a finishing room, and the paint finishing procedure there begun. In Universal's plant the cabinets were placed on sleds or skids and pushed

by hand from one operation to another. The process of finishing involves an application of stain, a washcoat, a filler, a sealer, and finally a lacquer, with intervening periods for rubbing and drying, dependent upon the character of wood and finishing material used. The materials were applied by brush or sprayer and rubbed by hand or mechanical buffer. Desirable characteristics could be upset by the character of materials, by deviation from prescribed procedures, or by varying human factors. After being waxed and polished, the cabinets were inspected by employees of Universal and sometimes by employees of the purchaser before shipment. If a substantial defect in structure or in finish was found, the cabinet was sent back for correction before shipment.

From the beginning of Universal's cabinet operations the lacquer supplied by duPont was known as Type 3, Code No. 16387. Due to the inability of duPont to procure certain ingredients of Type 3, it became necesssary in the month of December, 1946, for it to make a change in the components of this lacquer. The new lacquer was known as Type E, Code No. 16887. There is some testimony from representatives of Universal, not sustained by the records of that company, that according to their recollection shipments of Type 3 lacquer were continued until May or June, 1947, shortly before trouble appeared in the finishing processes in Universal's plant. However, written correspondence between the officers and representatives of Universal, invoices for the shipments, accounts payable, and other vouchers show rather conclusively that duPont began shipping to Universal Type E lacquer under Code No. 16887, with ingredients changed from those in Type 3, on December 7, 1946, and continued such shipments until July 21, 1947, when delivery of Type 3 was resumed, and that the substitution of Type E lacquer and the reasons for the change were made known to Universal. During the period involved, the orders of Universal for lacquer showed the change in the code numbers. The lacquer supplied bore the correct code number on its containers. Since the formula for the lacquer

was a trade secret, there was no mention of the character of the change of ingredients in the two types of lacquer. The substituted lacquer was received and apparently was satisfactorily used by Universal and normal production continued until June 16th or 17th, 1947, when the finishing difficulties hereinafter mentioned occurred.

On the night of June 17, 1947, inspection disclosed bad film separation between the sealer and the lacquer topcoat of cabinets that day finished. Two carloads of cabinets were inspected, and many were rejected for poor intercoat adhesion, a film separation referred to as "peeling." Representatives of duPont came to the plant, and on June 18th, they found by a common test, the slight pressure of a fingernail or coin drawn over the finished surface, that a separation occurred between the sealer and the topcoat. The sealing operations in the finishing room were temporarly shut down. A check then made of the duPont sealer and lacquer in stock by Universal revealed four different serial or batch numbers of sealer and two batch numbers of Type E lacquer. Two employees of duPont selected and personally sealed and lacquered eight groups of two each of model 81-WC cabinets, which had already been washcoated and filled, with all possible combinations of the batches of sealer and lacquer. At the conclusion each one of them showed some lack of adhesion.

Changes were made in the composition of the sealers and lacquer at the suggestion of duPont and production resumed on June 18th. On that day 200 cabinets were satisfactorily finished. Some others were rejected for white marks.

The evidence is conflicting as to the results accomplished thereafter. There is confusion on the part of Universal, because of lack of records, as to the exact dates and duration of the occurrences of "peeling." Universal's witnesses, testifying from memory, said the "peeling" condition continued to be fairly general over a period of a month, whereas records kept by representatives of duPont showed that "peeling" on new production occurred on only three occa-

sions and lasted for only one or two days at a time. After the changes had been made in the composition of the finishing materials, production results were fairly satisfactory on June 19th and 20th. Universal said that its finishing room was so clogged because of rejected cabinets that some of its wood cabinet assembly lines had to be shut down.

The next occurrence of "peeling" was discovered on the evening of Monday, June 23rd, and practically the entire production rejected for soft finish and poor adhesion. A new combination of materials was prescribed by duPont, and production resumed on June 24th, when a number of cabinets were satisfactorily finished. Production on June 25th, 26th, and 27th was normal.

Universal closed its plant for the usual summer vacation from Saturday, June 28th, through July 13th; but retained its finishing room personnel to straighten out the congestion in its finishing room and to wash some of the defective cabinets. Regular production otherwise was discontinued. At the end of the vacation period, a sufficient number of cabinets had been washed to enable Universal to begin normal operations at the various finishing stages upon the reopening of the plant on July 14th.

The washing of cabinets was described as a difficult and laborious task, requiring the employment of one hundred to one hundred and twenty-five men. Some cabinets peeled after being washed, and according to Universal "continued to peel spasmodically for several months." An attempt to wash the cabinets off by dipping them in a thinner fluid as suggested by duPont was unsuccessful, because the process loosened the glued joints. The method of washing them with chemical solvents was finally employed.

On the afternoon of July 14th, after the reopening of the plant and the resumption of production, "peeling" was again discovered. duPont's representative gave the number as 35. All sealing and lacquering were suspended on July 15th. duPont again changed the formula of its materials, and production was resumed. Universal's employees thought

that "peeling" continued through July 16th, 17th, 18th, and 21st. duPont's witnesses stated that production was normal and satisfactory on July 16th, 17th, and 18th. However, on July 21st, the formula was again changed, and on July 22nd, Type 3 lacquer, which had originally been supplied Universal, was again brought to Universal's plant and put into use. Cabinets finshed with it on that day did not "peel" and there was no "peeling" in current production after that day.

Universal did not, during the period involved in this controversy, keep a complete and accurate record of the number of cabinets that had "peeled" either on original finish or after being rewashed and refinished. Its bill of particulars sets out an "estimate" of 3,130 cabinets rejected by its inspection department in the months of June, July, August and September, 1947, as "not satisfactory in finish" for lacquer failure. Its superintendent estimated the number at between 4,000 and 4,500, and its finishing room foreman at 4,000. The superintendent said his estimate was "purely a guess on my part." The foreman said his estimate was "just an approximate figure." The superintendent, when asked to break down his figures, estimated that the number was 2,000 to 2,500 prior to vacation, 300 to 500 during vacation, and 500 to 800 after vacation, a total of 2,800 to 3,800, including cabinets rewashed during vacation. The estimates were made from memory, unsupported by the production of records. A representative of duPont estimated the number rejected for bad adhesion between June 16th and June 26th, to be 1,500. The number of rejections thereafter was, according to duPont's representatives, very much smaller than the estimates given by Universal.

There was no doubt that the finishing of the cabinets was defective on the occasions mentioned in June and July. duPont's representatives examined all of Universal's facilities and operations closely in an effort to find the cause. They were unable to find any fault of Universal to account for the "peeling." All the witnesses agreed that the situation

was unique in the history of the paint and varnish industry. None of them had ever before or since heard of anything like it. The "peeling" was spotty in character, that is, one area showed good adhesion while an adjoining area of the same panel had poor adhesion. The areas of poor adhesion varied in size, shape, location, and degree. It did not affect all of the cabinets that were currently produced under identical conditions. New combinations of finish materials appeared to give good results for a period of time. Weather conditions were substantially the same as those prevailing in the plant's area in periods prior to the peeling when production was satisfactory. Representatives and technical chemical experts of duPont and independent chemists energetically sought during the entire period involved until September, 1947, to ascertain the trouble.

There is considerable evidence as to the different characteristics produced by a change of ingredients in the various types of sealer and lacquer and by the form and manner of application of the materials. Chemists employed by each of the parties made separately a number of experiments with the finishing materials under varying conditions, and came to different conclusions as to the cause of the "peeling." Universal's witnesses attributed the trouble to the ingredients in the sealer and lacquer. duPont's chemists came to the conclusion that the lack of adhesion was due to the presence of paraffin wax in spots, applied through inadvertence, carelessness, or substitution of material. No one was able to explain how paraffin wax got on so large a number of cabinets. However, there was practically no peeling after the reintroduction of Type 3 lacquer in the plant.

With respect to the contention of duPont that it warranted only a uniformity of its finishing materials, Dr. C. J. Welz, its analytical chemist, explained that "Uniformity referred to both uniformity of chemical attributes and uniformity of performance characteristics of the finsh."

Beginning on September 10, 1947, some cabinets delivered

to Westinghouse were found to be faulty because of printed marks on their tops. This was called "printing," the trade name for an impression on the surface of a cabinet from contact with the container in which it is packed for shipment. Apparently, the printing resulted from placing the cabinets in a pressure-type packing carton instead of the usual floating type before the final coat of finish had had time to harden, and to the fact that the machine buffing used only on Westinghouse cabinets generated more heat and a greater consequent softening of the lacquer than the hand rubbing on other cabinets. Production for Westinghouse was suspended for a few days, and at the expiration of that time no remedy being found, and Universal having insisted on the continued use of the pressure-type packing, duPont requested Universal to discontinue the use of duPont's materials on that model. This was done on September 16th, and Universal changed to another supplier of finishing materials for Westinghouse cabinets.

Universal produced no records as to the number of cabinets involved in "printing." Its plant superintendent thought there were eight to ten carloads, "approximately 2,000." The administrative assistant of Universal testified that "The only trouble I can remember with the 166 was a few in a carload or two we sent up to Westinghouse that were packed in Kimpack, that is, the only trouble, bad trouble, I remember actually happening."

The bill of particulars specifies the number as approximately 1,500. No evidence was offered as to the cost of removing the print marks, a process requiring rubbing of the tops of the cabinetss and refinishing, or the time required to do the work.

Before, during and after the periods mentioned there were other finishing troubles. These consisted of "open pores," "pinholes," and "orange peel." "Open pores" were described as minute depressions in the finish of the surface, the result of incomplete filling of the pores of the wood. "Pinholes" are tiny holes in the finish, little larger than a

hole made by a pin, caused by an entrapment of air in the pore of the wood during the finishing process. "Orange peel" is a term for a finish that is rough or grainy like the outer coat of an orange. All were said to be common complaints in the finishing industry and due to various factors arising either from the nature of the materials or from the manner of application of the materials. After a large number of pinholes were observed in the week of July 28, 1947, duPont placed one of its servicemen in the plant on a full time basis, working from July 31 through August 28, in an effort to prevent the trouble.

The claim of Universal is principally based on the damages by reason of "peeling." With the several exceptions mentioned, no substantial amount of other defects was shown from faulty finishing materials.

In May, 1947, before the occurrence of the finishing difficulties, there was a daily average of two thousand cabinets in the finishing room and five hundred to six hundred in the cabinet assembly room. It was "estimated" by representatives of Universal that, notwithstanding the effort to clear the congestion during the vacation period, the assembly and finishing rooms contained between 7,000 and 8,000 cabinets on July 30th.

Turner A. Bridges, plant superintendent of Universal until June, 1946, and works manager thereafter, unable to solve the difficulties in the plant, resigned. He was succeeded by George F. Hessman on September 22, 1947. Hessman said that radio cabinet manufacture is "a crazy business," a controlling factor being the fact that at times the customer uses his inspectors to control the number of cabinets he accepts and buys. He found the following situation in the plant:

"It was in an utter state of confusion. It was congested and no even flow of work at all. I found cabinets in various stages of finishing, some were stained and some were filled and some were sealed and I also found after questioning that they were finished under different schedules and I attempted

to move some of them through, but no one could tell me at that time what formula or finish or procedure to follow."

Hessman said that ordinarily, under a formula recognized by the radio cabinet industry, it would take a plant like that of Universal three months to get back into normal production after production had been interrupted; but that conditions were so abnormal at Universal it required six months from the time he arrived.

On April 11, 1947, an assistant works manager of Universal wrote a duPont serviceman at Roanoke, Virginia, asking for his "comments" on a proposed finish specification of Radio Manufacturers Association. On May 2, 1947, W. S. Holmes, a regional industrial sales manager of duPont replied, in part, after discussing the specification submitted, as follows:

"Inasmuch as so many factors enter into the picture involving the application of our finishes, and conditions under which cabinets are used and exposed after the cabinets are finished, we cannot offer you any warranty such as quoted above. We offer the best products that we believe will give our customers the finish they desire, and after customer has tried and approved our offerings, we assume responsibility only for the uniformity of subsequent shipments of the materials approved and adopted by the customer."

It appears that by May, 1947, Universal had obtained a source of supply of raw materials for the operation of its plant. It had unfilled orders on its books which assured operation at capacity for five or six months, and was meeting its financial obligations promptly. It maintained for its production operations a system of cost accounting, which fixed its overhead costs for March, April and May, 1947, prior to the occurrence of "peeling" and the difficulties next mentioned, at 155% of its direct labor costs.

Both before and during the period in controversy, inspectors for Universal's customers rejected a high percentage of cabinets for causes not attributable to duPont's materials. Until early June, 1947, Universal had made

shipments only to Bendix. The bill of particulars sets out that Universal shipped 3,761 cabinets of Bendix model BW-71 in April and 4,485 of the same model in May. In April 78 of model BW-81-C were shipped and 4,000 of that model in May. Of these cabinets 5,883 were rejected in June and July by Bendix as defective. In addition, others were repaired by Bendix at its own factory at a cost of $18,149.48. These rejections were for poor workmanship, improper finishing, and structural defects, such as loose top moldings, legs, chassis, loose screws, and doors and lids rubbing, etc.

The returned cabinets were repaired at Universal's plant during the period in controversy, although the specific dates are not revealed. The repair work on them, other than repainting, was done outside of the finishing room. No record was kept of the number that did go through the finishing room in the final phase of the rework. Universal undertook to keep a record of the costs of repairing and refinishing. No itemized statement of the necessary elements was presented in evidence. According to its books, and as shown on its profit and loss statement for the period from July 1, 1947, to December 31, 1947, the original cost of production of these cabinets was $168,815.56, while their total sales value was but $124,385.74, a production cost of $44,429.82 in excess of sales value. Added to this loss was the sum of $97,448.17 expended on rework, and $18,149.48 paid to Bendix for repairs. The latter two sums added to the original cost of production brought a total of $284,413.57 expended on their manufacture. Deducting from the latter amount the sales value, there was sustained a total loss of $160,027.83. However, none of the loss on these cabinets is sought to be recovered from duPont.

The above profit and loss statement covered the entire operation of the plant for the period mentioned, but it particularized the loss suffered only as to the 81-C's. It did not itemize the production costs and sale values of the

several other cabinet models manufactured during the same period.

Universal inspected all cabinets in the "whitewood" as they came from the cabinet room, and. made a final inspection at the conclusion of finish. Then came inspection by the resident inspectors of its customers. The works manager of Universal admitted that, at the time of the beginning of this controversy, the normal rejection rate at the "whitewood" inspection, before any finish had been applied, was 65%, of which 30% was for major defects. On final inspection of finished cabinets 50% were rejected by Universal's inspectors, and of those passed 50% were rejected by resident inspectors of customers, 15% on account of major defects. Thus, only eight or nine of each one hundred cabinets assembled in the "whitewood" were accepted by the customers, without being sent back for rework at some stage of their manufacture. Many of those reworked were rejected one or more times thereafter.

Immediately after the occurrence of peeling in June, 1947, Universal directed its accounting department to set up an accurate account of the cost of cleaning and refinishing peeled cabinets. Two inventories of cabinets were made as of June 30, 1947, and July 12, 1947. Both were somewhat discredited by its own witnesses. No other inventories were offered in evidence.

The inventory of June 30, 1947, showed that there was in Universal's plant a total of 6,809 cabinets requiring refinishing. The models and their location were specified. Of that number 1,440 were classified as requiring refinishing because of "bad lacquer." The inventory of July 12, 1947, showed the number had increased to 1,864. The list included "Suspects," and "Lot Rejections." Of this number an inspector for Olympic had rejected an entire lot of cabinets because he found, upon examining "maybe ten or fifteen," that five or six had peeled. The June 30th inventory showed 2,768 cabinets requiring repairs or rework-

ing but did not separate cabinets in various stages of re-finish on account of defects other than peeling.

The 1,864 cabinets listed on July 12, 1947, as defective for bad lacquer consisted of 673 Model BW-71's, 539 BW-81-C's, 2 BW-82's, and 650 CA-84's. The prices of these cabinets, depending upon the model, ran from $23.56 to $58.25. The average price was about $45.

According to a summary of Universal's final inspection reports from June 1, to September 30, 1947, made by Robert E. Dye, an accountant employed by duPont, a total of 67,714 cabinets, new and reworked, were inspected during that period, and 33,810 were rejected, 44,633 defects were found and listed under eighteen headings as due to various causes, some cabinets suffering from one or more faults. 14,585 of the defects were attributed to mechanical faults. However, included under that heading was an undetermined number of defects due either to lack of adhesion of the lacquer film or to failure of "glue line adhesion." 7,116 defects were due to "burns in," 1,319 to bruises, 2,216 to "glue marks," 2,698 to "open pores," 2,250 to "poor rubbing," 7,060 to need of "touch up," 1,116 to "wash and refinish," 2,910 to need of "wool and wax," 804 to "lacquer runs," and 511 to "bad lacquer." Minor defects accounted for the balance.

Inspection reports from August 13th through August 21st, on an Olympic cabinet show that of 847 presented for inspection 229 were rejected for numerous defects and required reworking. Only 6 of those rejected were for lacquer failure, the remaining 223 were unacceptable because of defects in workmanship and structure.

A compilation of operating results in Universal's plant from June 1, 1947, prior to the occurrence of the peeling, showed that up to June 16th, 7,823 new cabinets were inspected and only 3,289 accepted. In the same period 7,400 reworked cabinets were inspected and only 3,960 accepted. From June 17th through June 27th, just before the vacation period, 9,129 new cabinets were inspected and 3,789

accepted. During the same period 6,149 reworked cabinets were inspected and 4,167 accepted. The percentage of acceptance of new cabinets from June 1st, to the 16th, was 43%, and from June 17th to June 30th, 42%. The percentage of reworked cabinets accepted from June 1st to 16th, was 54%, and from June 17th to 30th, 68%.

Universal's records showed that in the eleven working days between June 1 and June 16, before peeling occurred, it produced 3,489 cabinets as against 2,431 in eight working days between June 17 and June 30, that is, about the same daily average.

On July 15, 1947, Universal wrote duPont that because of lacquer failure it had established a production account to which would be charged against duPont all of the extra costs incident to refinishing operations on 1,864 cabinets with "bad lacquer;" and that the cost of refinishing operations would be the "same as the average production cost for the months of July and August if the job spreads out that far." Charges on that account were thereafter made from June 30th to December 31st, by month-end journal entries and transferred to the general ledger as follows:

| Date | Labor | Material | Factory | Total |
|---|---|---|---|---|
| 1947 | | | | |
| July 31 | $ 7,193.52 | $ 1,843.45 | $ 9,711.25 | $18,748.22 |
| Aug. 31 | 2,684.41 | 796.45 | 3,623.95 | 7,104.81 |
| Sept. 30 | | 123.75 | | 123.75 |
| Oct. 31 | 828.26 | 187.34 | | 1,015.60 |
| Oct. 31 | | | 1,118.15 | 1,118.15 |
| Nov. 30 | 1,167.19 | 32.14 | | 1,199.33 |
| Dec. 31 | 362.36 | 2.74 | 1,575.51 | 1,940.81 |
| 1948 | | | | |
| Jan. 31 | | | 489.19 | 489.19 |
| June 30 | | | | 1,290.20 |
| | $12,235.74 | $ 2,985.87 | $16,518.05 | $33,030.06 |

The accounting supervisor of Universal testified that

the cost of refinishing all cabinets that peeled prior to July 14, 1947, was included in the ledger charge of $33,030.-06. As a matter of computation, it appears that it cost approximately $18 per cabinet to refinish the 1,864 shown as peeled up to July 14th.

On August 23, 1947, however, Universal billed duPont for $65,208.94 for "June 1947 excessive production costs resulting from lacquer failure." This amount included labor and material, $13,124.88 and the remainder overhead, that is, $31,683.00 for "factory expenses" and $20,400.00 for "general and administrative expenses."

The explanation for the subsequent charge was that an accurate record of the costs of refinishing the peeled cabinets was not available and the ledger charge did not include the loss produced by the congestion of peeled cabinets in the finishing room bringing on an interruption of normal production. The $65,208.94 was added to the net operating loss charged against duPont for the last six months of 1947. This accounts for the amendment of the notice of motion with respect to the total amount claimed in this proceeding.

At the close of the fiscal year June 30, 1948, Universal made two journal entries on duPont's account. One was a credit of $33,030.06 in cancellation of the charge for that amount; the second was a charge of $650,000 against duPont, the amount for which the suit was instituted.

Correspondence passing between Universal and Bendix is illustrative of the situation with reference to the production and delivery of cabinets. On May 7, 1947, Universal sent the following telegram to Bendix:

"BRISTOL, VIRGINIA          May 7, 1947
"W. P. HILLIARD, GENERAL MANAGER
BENDIX RADIO DIVISION

"UNABLE PAST WEEK REACH YOU BY TELEPHONE. SITUATION HERE EXTREMELY CRITICAL, ON BW71 WALNUT DUE TO INDECISION OF COLOR AND SELECTION OF GRILLE CLOTH. ONLY RECEIVED 200 GRILLE CLOTHS ONLY PROMISED 350

FOR WEEK THEN AT RATE OF 1000. HAVE OVER 2000 CABINETS BACKED UP NECESSITATING LAYOFF APPROXIMATELY 150 PEOPLE OVERHEAD ON WHOM IS APPROXIMATELY $1200 PER DAY. ACCORDING TO CONTRACT BENDIX OBLIGATED TO PAY CHARGES FOR DELAYS OCCASIONED BY THEM. PLEASE CALL IMMEDIATELY FOR MORE DETAILS AS DECISION IMPERATIVE."

On July 11, 1947, the President of Universal wrote Bendix that the 81-C situation is fast becoming intolerable because cabinets of excellent quality were being returned without good cause.

On August 1, 1947, Universal complained by letter to Bendix that the latter appeared to be unwilling or unable to accept cabinets as fast as produced, and that its inspectors were refusing even to go through the form of inspection, although the turnout of cabinets was better than the standard agreed upon.

In a sharp letter of protest, dated August 6, 1947, T. H. McKoy, Jr., President of Universal, wrote Bendix that its arbitrary failure to accept delivery of cabinets had produced an intolerable situation in Universal's plant and a stoppage of its production. This letter reads as follows:

"The situation between your corporation and ourselves has reached a stage which from our viewpoint is financially and physically intolerable.

"As of the close of business yesterday we had at hand in our plant, under your Purchase Orders R-04775,-5606, and -6322, assembled and in various stages of completion in our Finishing Department approximately 3,600 Model BW-71s and 5,200 Model BW-81Cs. The total overall dollar value of these cabinets together with accrued costs of detail parts and raw materials, is in excess of $500,000.00. While we have been able to present for your inspection and acceptance cabinets at the rate of 300 or better per day, your inspection

procedure has limited our shipments to an average of less than 100 per day as is evidenced by our July shipments. From July 17 to noon on August 5, you actually bought a grand total of fifteen cabinets. The tie-up, as evidenced by innumerable conversations and letters, is in your inspection procedure. We refer particularly to letter from Mr. Page to Mr. Hicks dated August 1, 1947. We have, (a) instituted our own rigid type of inspection and (b) have had cabinets coming off our production lines examined by independent qualified observers to appraise the quality of the cabinets presented. Both our own inspectors and these independent appraisers concur that the overall quality of the cabinets presented to your inspector, Mr. Crossley, and his staff equals or exceeds in quality the agreed upon standard sample cabinet mutually approved by us on February 28, 1947. The acceptability of our cabinets is further evidenced by the fact that you have, over a period of months up to June 30, 1947, accepted and paid for over 13,000 BW-71s and over 4,000 BW-81Cs. Inquiry reveals that your inspection staff has been instructed not to inspect to the agreed upon sample and not to approve any cabinets which under any circumstances Bendix would have to retouch in any way. Your Mr. Hicks has informed several of our personnel, in the presence of witnesses, that he will buy cabinets only as he needs them and has admitted that inspection procedure is the means used to increase or decrease your rate of acceptance. We are further advised and have written evidence that current rejections in our production are due to slow downs in your own production schedules. All of this, of course, is in violation of our existing agreement.

"As a consequence of your rejections our inventories of your work-in-process and finished cabinets have built up to absolute maximum limits permitted by good business judgment or permissible under the limitations of our bank loan agreements; and to avoid further increases in inventory and because of the physical limitations of our plant as to stor-

age, etc., we have been compelled, effective August 5, 1947, temporarily to shut down our assembly lines on the balance of your production orders.

"During the month of August we are prepared to finish and present to our inspectors an average of 200 BW-71s and 100 BW-81Cs daily. Our inspectors in turn will present to you such portion of these cabinets as they deem of suitable quality for your inspection and acceptance.

"Should your inspectors decline to look at these cabinets, as has frequently been the case in the past thirty days, we will proceed to package them and store them for your account. * * * "

"Yours very truly,

"UNIVERSAL MOULDED PRODUCTS
CORPORATION

"T. H. McKoy, Jr.
President."

Mr. McKoy did not testify in the case, and no serious effort was made to explain the inconsistency of his view of the situation in his plant with the contentions of the plaintiff in this proceeding.

On November 7, 1947, the Vice-President and General Manager of Universal wrote Bendix, in part, as follows:

"We understand that you do not need, prior to January 1st, 1948, approximately 2200 BW-71 cabinets which we have already made, and that it will be agreeable to you if we finish them at least somewhat at our convenience. Please understand that we are desirous of getting them to you as soon as possible in order to clean our plant of all of these cabinets, and we will proceed to do so at the earliest possible moment.

"The BW-71's which are not now assembled, we will hold at least until after the first of the year, at which time you will be able to make a decision as to whether or not you want them completed."

On January 28, 1948, Universal complained to Bendix that the latter's "continual" failure to cooperate in carrying out its agreement to accept and take delivery of cabinets over a long period beginning on April 18, 1947, was "becoming intolerable" and causing a great loss to Universal.

The differences between Universal and Bendix as to BW-71 cabinets were not settled until September, 1948. Bendix agreed to accept 1,848 already assembled, at a reduced price, if they could pass inspection, and pay Universal $15,000 on account of 2,266 that were in process of completion. The 2,266 were to remain the sole property of Universal; but Bendix was to have the benefit of any salvage obtained from disposal of the cartons and packing material supplied by it for those cabinets. The contract of February 1, 1947, and all other agreements between the parties were terminated, and each party released from the obligations therein contained, with the exception of certain matters not material here. The 1,848 completed cabinets were in the possession of Universal at the end of its fiscal year, June 30, 1948. They had been carried in its previous inventories of finished goods on hand and were thus involved in its profit and loss statements subsequent to August 6, 1947.

In February, 1948, after the institution of this suit, Universal employed T. Coleman Andrews, a certified public accountant of large experience, to undertake an audit of its books, accounts and records in connection with the proof of its claim in this proceeding. Andrews said that his objective was the ascertainment of the costs, expenses and income of Universal, according to accepted accounting methods, from February 1, 1947, through the fiscal year

ending July 1, 1948, based upon the books and records of Universal and information obtained from counsel and management of Universal, within the requirements of the bill of particulars in this proceeding. He and several of his assistants spent considerable time in Universal's accounting department and examined all the books, records and supporting data maintained in the conduct of its business. He said he found that "the conditions in this plant, accounting-wise and otherwise, were terribly confused in this period (the last six months of 1947). The whole thing was like shooting into a flock of quail." He pointed out that Universal's records did not show a "clear and conclusive demarcation between regular production costs and extraordinary production costs," except to the limited extent set up on the special job orders for repair of the returned 81-C's and refinishing of cabinets which peeled in June. The books showed excessive costs throughout the plant during the month of June and the overhead was almost double that during the prior three months.

Books, records, accounts, vouchers, invoices, ledgers, material requisitions, payroll time cards, and supporting data examined by Andrews were described and authenticated by employees of the accounting department of Universal, and were shown to have been the regular records kept contemporaneously in the regular course of Universal's business. They were made available to duPont's auditors and counsel and by them examined.

From the above records and reports of Universal's employees, Andrews prepared a profit and loss statement of Universal's operations from July 1, 1947, to December 31, 1947, showing the total costs of production, including overhead, and the total income from sales and other sources. In this statement, he specifically allocated to the 81-C cabinets the respective amounts, hereinbefore set out, for costs of production, rework and repair and the amount of their sales value, showing the loss of $160,027.83. A profit

of $4,039.64 was stated from non-cabinet operations. Summarized his statement showed the following:

### Production Costs

| | |
|---|---:|
| Labor | $564,319.43 |
| Material | 898,816.17 |
| Manufacturing expenses | 960,683.74 |
| Tooling | 23,310.35 |
| Administrative and general expenses | 151,283.64 |
| Selling expenses | 14,904.34 |
| Interest | 48,311.37 |

| | | |
|---|---:|---:|
| Total | | $2,661,629.09 |
| Sales & other income | | 1,883,947.19 |
| Loss for six months | | $ 777,681.90 |

The above amount was subject to the following credits:

| | |
|---|---:|
| Expenses of this proceeding: | $ 15,000.00 |
| Loss on 81-C's | 160,027.83 |
| Total | $175,027.83 |

| | | |
|---|---:|---:|
| Less profit from non-cabinet operations | | 4,039.64 |
| Deduct | $170,988.19 | 170,988.19 |
| Net adjusted loss for 6 months | | $ 606,693.71 |

Andrews was permitted to select certain base periods of Universal's operations from March, 1947, to November 30, 1948, for a comparison of profit or loss in operating the plant. He fixed one base period as March, April and May, 1947, prior to the occurrence of the finishing failures, and

said that the books of Universal showed a net profit of $44,431.40, after recovering cost and expenses amounting to $1,481,808.40. He eliminated February, 1947, from that period because it was a transition month after the lease of Bendix had been terminated, and June, 1947, because of a claim filed by Universal against duPont for losses in that month. Two other operating periods after April 1, 1948, according to Universal's books and records, were selected. The first of these periods was from April 1, 1948, to September 30, 1948, chosen as a period when the total sales volume was the same as the total sales value of orders on hand when peeling began, and during this period Universal showed a net profit of $170,901. The period from June 1, 1948, to November 30, 1948, was selected because the average sales volume per month in that period was approximately the same as the average sales volume per month in the base period before the finishing failure. In the latter period the books showed that Universal, after recovery of its costs and repairs, made a net profit of $223,799.

Andrews was allowed to testify that the records of Universal showed that it received rental payments from Bendix amounting to $2,041,236.56 between October 1, 1945, and February 1, 1947. This included manufacturing expenses on a cost plus basis, administrative and general expenses, management fee of $93,500 each six months and rental of machinery $10,000.

The October 1, 1945, contract between Universal and Bendix provided that the latter should pay Universal for the first six months all direct labor, direct material, manufacturing overhead, and general administrative expenses incurred in the production of Bendix cabinets. The general administrative expenses were not to exceed 4% of the aggregate of the actual amount of direct labor, direct material, and manufacturing overhead. Bendix was to pay, in addition, for each six months' period a rent of $10,000 for the plant, and a fee of $93,500 for services of consulting engineers and personnel management of Universal. The contract was to

run five years, with the privilege of termination by either party upon a forty-five days' notice given prior to any six months' period. The amount above mentioned was to be the maximum for any six months' period, any change thereafter being subject to varying conditions and agreement of parties involved.

The evidence discloses that in 1948 conditions in the plant differed from those in 1947, both with respect to personnel and to the kind and number of cabinets manufactured. Methods of inspection were not shown to be the same.

Universal practically completed its shipments of certain Bendix, Olympic, and Westinghouse cabinets by the end of 1947. In March, 1948, it shipped, for the first time, a new model to Radio Corporation of America and another model in August of the same year. It began shipments of new models to the General Electric Company in April, 1948; to the Crosley Corporation in June, 1948, and to the Emerson Radio Company in April, 1948. Its total 1948 shipments of all models were 98,842. Of that number, 80,815 were for manufacturers not dealt with in 1947.

There is no evidence that Crosley, Emerson or General Electric kept resident inspectors at the plant. In 1947, when Bendix was its principal customer, its inspector spent all of his time at Universal's plant until May, 1947. He then left, returned in June and thereafter divided his time between Universal and a plant of another manufacturer in a different city. During his absence a large number of the cabinets shipped in May were returned by Bendix in June, 1947.

The comptroller of Universal said that the cabinets returned in June had been manufactured in March, April and May. Special and separate job accounts were set up for reworking them and for those which peeled in June, 1947. He also said that Bendix ordered a cutback in production of 71's in June, and Universal immediately advised Bendix that the result would mean an increased overhead, costly to the producer. In that month there was also some difficulty

in procuring sans arb or decalcomania, that is decorative adornments for the cabinets, which slowed production.

After June, 1947, no record of the number of cabinets with bad lacquer was kept, nor the cost of refinishing them. The records of Universal did not show the cost of its normal wash and refinish work during June, July, August and September, 1947, as distinguished from the extraordinary costs due to peeling, or separate the cost of one item for repair or refinish from any other.

A summary of entries made on the books of account of Universal from February 1st through June 30th, 1947, showed the following as to sales and costs of production:

| Bendix Radio Cabinets: | Sales | Cost of Sales |
|---|---|---|
| BW 82—Mahogany and walnut ..............$ | 565,075.57 | $ 534,846.04 |
| BW 82 Knotty pine.... | 224,799.93 | 180,736.21 |
| Platt 0025 ............. | 49,410.00 | 63,897.62 |
| Platt 0026 ............. | 437,246.47 | 444,068.43 |
| BW-71—Mahogany ..... | 547,855.67 | 565,181.91 |
| BW-71 Walnut ........ | 110,155.50 | 113,914.93 |
| BW 81 C............. | 97,557.23 | 149,051.75 |
| Olympic radio cabinets: | | |
| CA-846 ............... | | 6,915.09 |
| Miscellaneous cabinets & parts ............... | 36,654.48 | 42,414.33 |
| Miscellaneous sales ..... | 18,922.03 | 19,255.75 |
| Unabsorbed factory expense ............... | | 96,177.03 |
| General & administrative expense ............. | | 153,959.77 |
| Selling expense ........ | | 14,446.67 |
| Totals .........$ | 2,087,676.88 | $ 2,384,865.53 |

Thus, without consideration of overhead expenses, there was shown a profit of $74,293.25 on Model BW-82, and an

operating loss on the production of six other models and miscellaneous merchandise amounting to $106,898.43. Giving consideration to overhead expenses amounting to $264,-583.47, there was a net overall loss of $297,188.65 in operating expenses for the five months' period.

Lawrence L. Jones, accounting supervisor of Universal, said that Universal's system of accounting did not provide for an allocation of unabsorbed factory expenses or overhead to specific models, and that such expenses had been pro-rated and based on the cost of direct labor. He further explained that some of the entries included in the estimate of the total overhead expenses were applicable to other periods of production, and that consequently without proper adjustments, the summary did not represent a correct profit and loss statement for the period involved.

The works manager of Universal who resigned in September, 1947, because of conditions in the plant, explained that no records of peeled cabinets were kept because peelers were discovered and turned back while on the rubbing line before reaching the inspectors. The comptroller said that, "The thing that defeated us in compiling the cost of lacquer failing cabinets was the great number that occurred, the unpredictability of the finishes in July and August, and the complete confusion which we found in our finishing department during those two months."

Five instructions, numbered from 1 to 5, were given the jury at the request of Universal and ten, alphabetically identified, were given at the request of duPont.

Instruction No. 1 related to warranties and defined an implied warranty and its effect. No. 2 related to an express warranty and defined its effect. Nos. 3 and 4 related to the credibility of witnesses. No. 5, two printed pages in length, related to the quantum of damages, the measure and proof thereof.

For the purposes of our discussion, it is only necessary that we analyze No. 5. It was in accord with plaintiff's contentions. Paragraphs one, two and three told the jury

that if they found for the plaintiff, it was entitled to recover the actual damages it sustained between June 16th and December 31, 1947, as a proximate result of the finishing defects mentioned in the evidence, in so far as duPont should reasonably have known that such damage would result from such defects, excluding therefrom any recovery for loss of good will or net corporate profits, which it might or might not have experienced, except for the events alleged in this proceeding. Paragraph five recited that plaintiff's actual damages, if any, were not limited to the actual expenses of reworking and refinishing the defective cabinets; but that the jury might also consider damages, if any, to its business within the seven months' period mentioned, "measured by the extent to which" the jury might believe that the finishing defects prevented it "from rcovering from the proceeds of its radio cabinet sales any part of its cost and expenses applicable to cabinet production in such period." Paragraph six told the jury that in determining the amount of damages sustained, it was proper "to consider expenditures for wages, salaries, materials, tooling costs, manufacturing overhead, general and administrative expenses, interest, and any other ordinary and regular expenses" of its cabinet operations during the period mentioned, which the plaintiff "was unable to recover from the proceeds of sales" of its cabinets, the damage being "limited to those which were reasonably foreseeable by the defendant and were the direct and proximate result of the finishing defects already mentioned." The seventh paragraph instructed the jury that if they found a loss established, it was not necessary that the amount of such loss should be proved with absolute certainty, and if the evidence was such "as to permit an intelligent and probable estimate of the amount," the jury should fix the damages at such sum as they found to be fair and just. The eighth paragraph advised the jury that in fixing the amount of damages, it should consider the plaintiff's radio cabinet production and income from such production both before June, 1947, and after December 31, 1947, not for the purpose

of measuring the loss but to assist it in making an intelligent and probable estimate thereof.

It is established that defective finishing of cabinets resulted from the use of duPont's material. duPont admits it was unable to establish that the procedures of its application were not in accord with prescribed systems.

duPont denies it made an implied warranty of the suitability or fitness of its materials. It claims that its express warranty of uniformity of its products negatived an implied warranty, if any ever existed, and that its express warranty was not shown to have been breached. It argues that Universal's evidence, as a whole, was unreliable, speculative and nebulous, consisting of guesses and estimates in contradiction of records; that there were many factors which showed that the congestion of unacceptable cabinets was produced from faults not attributable to duPont; that the evidence of damages was speculative and conjectural; that the comparative figures offered to show operating results in selected periods had no probative value; that there was no competent proof of the several items of expense alleged; and that instruction No. 5 was repetitious, argumentative, and contained inapplicable statements of law. It further insisted that there was no proximate connection between the loss claimed and the alleged breach of contract, in that the operating losses claimed were not foreseeable, at the time of the execution of its contract to supply finishing materials, as the probable result of the breach.

It sufficiently appears from the evidence that there was an implied warranty by duPont that its finishing materials would be reasonably serviceable and fit for the particular uses to which it knew they were to be put by Universal; that Universal relied upon duPont's skill in selecting and manufacturing the materials and adopted the prescribed process for applying them; and that by reason of the failure of duPont to comply with its warranty, Universal sustained substantial loss and damage.

In *Universal Motor Co.* v. *Snow*, 149 Va. 690, 140 S. E. 653, 59 A. L. R. 1174, we approved this principle:

■ "When one contracts to supply an article in which he deals, to be applied to a particular purpose, so that the buyer necessarily trusts to the judgment or skill of the vendor, there is an implied warranty that it shall be reasonably fit for the purpose to which it is to be applied; and the better doctrine is that this rule applies to dealers as well as to manufacturers and not to manufacturers alone."

In *Gerst* v. *Jones, supra*, and *Greenland Develop. Corp.* v. *Allied Heating Products Co.*, 184 Va. 588, 35 S. E. (2d) 801, 164 A. L. R. 1312, this principle is also approved.

■ There is no merit in the contention of duPont that its express warranty mentioned in the letter of May 2, 1947, negatived an implied warranty of the fitness of its materials, and furthermore was inconsistent with such a warranty. The letter discloses no disclaimer. There is nothing in it to change the basis on which Universal and duPont had dealt for almost two years. It was written merely in response for comments upon certain proposed technical finishing specifications of the Radio Manufacturers Association. Its reference to warranty was purely gratuitous and not in response to the inquiry made by Universal.

■ Nor do we think that the express warranty as to uniformity of quality and ingredients was inconsistent with the implied warranty that the materials furnished would be reasonably fit for the particular purpose desired. The two warranties were complementary rather than conflicting. There was nothing inconsistent between the duty to supply uniform materials and the duty to supply materials fit for the purpose for which the seller knows the buyer is purchasing them.

In *Greenland Develop. Corp.* v. *Allied Heating Products Co., supra*, we held that an express warranty against defective materials and workmanship was not inconsistent with the implied warranty by the seller that certain heating units would be reasonably suitable for the purpose of heating

residential homes and would perform such service in a reasonably suitable manner.

In *Standard Paint Co.* v. *Vietor*, 120 Va. 595, 608, 91 S. E. 752, it is said:

"It is perfectly well settled that when one sells an article of personal property, there is an implied guarantee that it shall be reasonably serviceable and fit for the peculiar uses to which the vendor knows it is to be put (*Gerst* v. *Jones*, 32 Gratt. (73 Va.) 518, 34 Am. Rep. 773); and it seems clear that, notwithstanding the written paper, inasmuch as it is perfectly certain that the vendor knew that the roofing was intended for buildings required to be water-tight, it may be fairly inferred that there was this implied guarantee."

duPont contends that much of the testimony of T. Coleman Andrews, an outside accountant, was inadmissible on the question of damages because without proper verification by the persons who made the records he relied on, and that there was no occasion to use expert testimony.

As we have stated, the books and records relied upon by Andrews were properly described and shown to have been the regular records kept in the regular course of business of Universal.

In Virginia, we have adopted the modern Shopbook Rule advocated by Professor Wigmore, allowing in given cases the admission of verified regular entries without requiring proof from the original observers or record keepers, as a recognized exception to the hearsay rule. 5 Wigmore, Evidence, (3rd. Ed.) section 1530, pages 379, 383.

In *Lyric Theatre Corp.* v. *Vaughan*, 168 Va. 595, 604, 191 S. E. 600, quoting with approval from the same author, 2 Wigmore, Evidence, section 1230, we said:

"Where a fact could be ascertained only by the inspection of a large number of documents made up of very numerous detailed vouchers,—as, the net balance resulting from a year's vouchers of a treasurer or a year's accounts in a bank-ledger—it is obvious that it would often be practically out of the question to apply the present principle (produc-

tion of documentary originals) by requiring the production of the entire mass of documents and entries to be perused by the jury or read aloud to them. The convenience of trials demands that other evidence be allowed to be offered in the shape of the testimony of a competent witness who has perused the entire mass and will state summarily the net result. Such a practice is well established to be proper.
* * *

"The most commonly recognized application of this principle is that by which the state of *pecuniary accounts* or other business transactions is allowed to be shown by a witness' schedule or summary."

See also, *French* v. *Virginian R. Co.*, 121 Va. 383, 93 S. E. 585; *Radtke* v. *Taylor*, 105 Or. 559, 210 P. 863; 1 Jones, Evidence, (4th Ed.) section 206, page 401.

Testimony of accountant Andrews merely proved the operations of Universal from a financial standpoint according to its records. It was insufficient to show that the loss incurred was due to the wrongdoing of duPont. In other words, it did not establish responsibility for the factors which created the loss, or allocate the loss to the factors involved.

It is difficult to formulate definite rules which will measure the extent of recovery of damages in all cases, even of a particular class, owing to the consideration which must be given in each case to its specific and, perhaps, peculiar surrounding circumstances.

In general, the same principles govern in the right to recover an operating loss as in the case of loss of profits. The former is merely an added charge to the latter. Loss in operations and loss of profits are similar to all other elements of damages. In broad terms, it may be said that "Damages recoverable for breach of contracts are such as may fairly and reasonably be considered as arising naturally— that is, according to the usual course of things,—from the breach of the contract itself, or such as may reasonably be supposed to have been contemplated by both parties at the

time they made the contract, as the probable result of the breach of it." *Manss-Owens Co. v. Owens & Son,* 129 Va. 183, 201, 105 S. E. 543.

In *Alleghany Iron Co. v. Teaford,* 96 Va. 372, 31 S. E. 525, an action for a breach of contract to accept delivery of iron ore, a recovery of profits was allowed. The plaintiff had an established business and proved the amount of ore that he could have delivered but for the breach, and the difference between the contract price and the cost of delivery. There we said:

"The object of the law, in awarding damages, is to make amends or reparation. It aims to put the party injured in the same position, as far as money can do it, as he would have been if the contract had been performed."

In *Bristol Belt Line R. Co. v. Bullock Elec. Mfg. Co.,* 101 Va. 652, 44 S. E. 892, the operation of a street car company was suspended for several weeks during the best season of the year because of breach of contract for delivery of a generator. Plaintiff showed the number of fares collected on the five days preceding and the eight days following the suspension. It based its claim on the assumptions that the same average daily fares would have been received during the suspension and that its expenses would have been normal. It failed to show any charges incident to operation, so as to establish net profit. Recovery of profits was denied on the ground that the proof was too speculative and conjectural to establish with a sufficient degree of certainty the definite amount of damages sustained.

In *Whitehead v. Cape Henry Syndicate,* 111 Va. 193, 68 S. E. 263, the licensee of certain commercial fishing rights was improperly enjoined from the exercise thereof. Upon dissolution of an injunction he brought suit for the damages thereby sustained. He was allowed to recover the amounts he had expended in the purchase and erection of a pound pole net, but was denied profits anticipated while the injunction was in force. He was unable to prove with required certainty the amount of profit, if any, he would have

made, but for the interruption of his business,—a business which had been operated for only a month, with no established earning capacity.

In *Atlantic Coast Realty Co.* v. *Townsend*, 124 Va. 490, 98 S. E. 684, it was held, on a demurrer to a declaration, that a broker was entitled to an opportunity to prove, if he could do so, with the required certainty, the profit that he might have made but for the breach of his client's contract granting him the exclusive right to sell certain real estate.

In *Manss-Owens Co.* v. *Owens & Son, supra,* the plaintiffs were allowed to recover for breach of contract where they were deprived of the exclusive right to sell goods in a certain territory upon commission. Judge Prentis, afterwards Chief Justice, said:

" * * * one who violates his contract with another should generally be held responsible for all direct and proximate damages which result from such violation. Such damages must be not merely speculative or imaginary, they must be reasonably certain, and they must be consequent upon a breach of the contract. If they are so remote as not to be directly traceable to that breach, or are attributable to some other intervening cause, then they cannot be allowed. Such damages, however, are nearly always involved in some uncertainty and contingency, and can be determined only approximately upon reasonable conjectures and probable estimates. If they are so uncertain, contingent and imaginary as to be incapable of adequate proof then they cannot be recovered. When, however, it is certain that substantial damage has been caused by the breach of a contract, and the uncertainty is not whether there have been damages, but only an uncertainty as to their true amount, then there can rarely be any good reason for refusing all damages due to the breach merely because of that uncertainty."

The court in considering the value of the contract held:

"The *only practical way* to determine this value was to introduce evidence as to the probable amount of sales which

they would have made if they had been allowed to perform their contract, and the best way to make an intelligent estimate of this value was to consider the extent of the territory and the past experience of the plaintiffs in selling goods of a similar character in that territory." (Emphasis added).

In *Forbes* v. *Wyatt*, 143 Va. 802, 129 S. E. 491, a lessor of a warehouse with an established and profitable storage business, was allowed to recover the loss of profits based on previous earnings of his business where the landlord wrongfully delayed the delivery of a building. In that case the loss was established by an itemized account.

In *Sinclair Refining Co.* v. *Hamilton & Dotson*, 164 Va. 203, 178 S. E. 777, 99 A. L. R. 929, a landlord breached an agreement to erect an addition to a demised building so that tenant could open a paint shop. Recovery of anticipated profits from operation of the paint shop was denied because it was a new business and the alleged profits were so contingent, conjectural and speculative that the amount could not be proved with a reasonable degree of certainty.

In *Haywood* v. *Massie*, 188 Va. 176, 49 S. E. (2d) 281, the plaintiff was, through interference with an easement, denied the access to land which she intended to cultivate. Recovery of expected profits from her farming operations was denied because too remote, speculative, contingent and uncertain.

See also, *Virginia Public Service Co.* v. *Steindler*, 166 Va. 686, 187 S. E. 353, 105 A. L. R. 1413; *Krikorian* v. *Dailey*, 171 Va. 16, 197 S. E. 442; 15 Am. Jur., Damages, section 155; 25 C. J. S., Damages, section 26, *et seq.*, and section 71.

In *Gulf States Creosoting Co.* v. *Loving*, and a companion case, (C. C. A. 4), 120 F. (2d) 195, recoveries of losses for interruption of business were allowed, where defendants breached contracts to deliver piling and lumber to highway bridge contractors according to schedule. The losses claimed were itemized and particularized. Each represented a loss

directly caused by defendants' delay in delivering materials. The facts as to the damage in each instance were not disputed. In one of the cases recovery of the full amount of an item was denied because the evidence relating thereto was vague as to the allocation of certain expenses, and consisted entirely of opinions and estimates without disclosure of the method by which the total calculation was reached.

It is a well established rule of the common law that the damages to be recovered for a breach of contract must be shown with certainty, and not left to speculation or conjecture. In *Griffin* v. *Colver*, 16 N. Y. 489, 69 Am. Dec. 718, some general principles were laid down which have been extensively quoted with approval. There Selden, J., said: "The broad general rule in such cases is that the party injured is entitled to recover all his damages, including gains prevented as well as losses sustained; and this rule is subject to but two conditions. The damages must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract; that is, must be such as might naturally be expected to follow its violation; and they must be certain, both in their nature and in respect to the cause from which they proceed. The familiar rules on the subject are all subordinate to these. For instance: That the damages must flow directly and naturally from the breach of contract is a mere mode of expressing the first; and that they must be not the remote but proximate consequence of such breach, and must not be speculative or contingent, are different modifications of the last. These two conditions are entirely separate and independent, and to blend them tends to confusion; thus the damages claimed may be the ordinary and natural and even necessary result of the breach, and yet, if in their nature uncertain, they must be rejected. * * * ." 2 Sutherland, Damages (4th Ed.) section 665.

Proof of absolute certainty as to the amount of loss or damage is not essential when the existence of loss is established and the facts and circumstances proven are such as to

permit of intelligent and probable estimate of the amount of damage or loss sustained. *Wyckoff Pipe, etc., Co.* v. *Saunders*, 175 Va. 512, 518, 9 S. E. (2d) 318; *Greenland Develop. Corp.* v. *Allied Heating Products Co.*, *supra*.

The above cases and authorities lay down and emphasize the following fundamental requirements for the recovery of loss of profits:

(1) The damages must be established with reasonable certainty. If remote, speculative, contingent or uncertain, they are not recoverable.

(2) The breach of contract must be the direct and proximate cause of the damage, which must be naturally and directly traceable to the act of the wrongdoer.

(3) The consequences of the wrongful act must have been reasonably foreseeable by the parties at the time of the execution of the contract.

The distinction which exists between the interruption of an established business and a new business is recognized. Where the breach of a contract causes an interruption in a business with an established earning capacity, and there is no other practical way to estimate the damages thereby caused, evidence to show the prior and subsequent record of the business has been held admissible to permit an intelligent and probable estimate of the amount of damages thereby sustained; but where a new business or enterprise is involved, the rule is not applicable for the reason that such business is an adventure, the successful operation of which depends upon future bargains, states of the market, and on too many other contingencies to furnish a safeguard in fixing the measure of damages. *Whitehead* v. *Cape Henry Syndicate*, *supra*; *Forbes* v. *Wyatt*, *supra*; *Sinclair Refining Co.* v. *Hamilton & Dotson*, *supra*; 25 C. J. S., Damages, section 42b, page 518; 15 Am. Jur., Damages, section 134, page 542.

We have found no case nor has any been cited to us where the facts were similar to those in this proceeding. The situation here is distinctly different from that in the

cases cited above. In each of those cases the wrong of the defendant was the sole producing cause of the damage claimed; there were no intervening factors, or additional wrongdoers.

In this case, there were a number of intervening and contributing factors, definite and indefinite, not related to the acts of duPont, some, or all, of which contributed in large or small degree to the delay and interruption of Universal's normal operations.

In other words, the condition which prevailed throughout the entire plant of Universal, during the period here involved, was not a consequence which could be measured solely by reference to any specific item of damage, or particular wrongdoer.

Radio cabinets are not a staple commodity. Here, their design, quality, construction and finish were fixed not by Universal, but by its customers, and they were useful only to the radio distributors for whom they were made. The contract price was a matter of negotiation which depended upon manufacturing cost and demand for the product. It will be remembered that Hessman said cabinet manufacturing was a "crazy business," because of the uncertainty caused by its customers in inspection methods. Schedule of production and good business practice required that they be shipped as soon as completed, and consequently the status of the facilities for storing them was dependent upon existing schedules of production and delivery.

The record does not show that Universal had an established, permanent earning capacity, either immediately before or immediately after the period in controversy. It had been in the manufacturing business on its own account less than five months when the peeling troubles began. Prior to February 1, 1947, operating on a fixed cost-plus basis, it was assured of its expenses and a certain profit. After it entered the competitive field it merely anticipated profits. Expected profits were dependent not only on its manufacturing skill and efficiency, but on its ability to obtain

purchasers and satisfy their demands, which, in turn, depended on the favor of the ultimate users of the product manufactured. Its situation after February 1, 1947, was, therefore, vastly different from that prior thereto and more risky.

In May, 1947, the unit costs of cabinets, which naturally went up or down with the volume of sales, was low because the temporary absence of Bendix's inspector permitted the shipment of thousands of defective cabinets. When 5,883 cabinets, all manufactured in March, April and May, were returned in June, the amount for which their sales had been credited in May was accordingly charged back against sales in June. By the reduction of June sales unit costs for that month were increased. Profit and loss statements were affected accordingly. The costs of refinishing the cabinets which peeled in June were carried on Universal's general ledger as charges against duPont during the succeeding months. The reason for Universal's good showing in its profit and loss statement for March, April and May, 1947, is apparent.

On some models Universal made a profit and on others it lost money. As shown by its profit and loss statement for the period from July 1 to December 31, 1947, it suffered a loss of $160,027.83 on Bendix Model 81-C alone, not attributable to defective finishing. The loss on 71-W's is not given. Although the loss on 81-C's was carried on the statement for the last six months of 1947, it was occasioned by improper construction, in March, April and May, 1947. Consequently, the allocation of the loss to the last months of the year made the operations for those months appear less favorable, and for the former months more favorable. If the entries on the books of Universal be considered as reflecting its financial operations from February 1 to June 30, 1947, it suffered a loss of $297,188.65 for that period, as compared with a profit of $44,431.41, shown on its profit and loss statement for March, April and May, 1947. This constituted a loss of approximately $60,000 per month

for the five months period, without including the cost of refinishing cabinets that peeled in June and expenses of repairing the thousands of defective cabinets which had been manufactured prior to June 30, 1947.

The congestion of peeled cabinets in the finishing room was only one of the causes in slowing down production. Universal's records show that during the last half of June, the daily average of new cabinets presented for inspection was nearly double that of the first half of the month. According to Universal's President, its then principal customer was not only upgrading its inspection standards, but arbitrarily refusing to accept cabinets. Although most of the 81-C cabinets rejected in June were stored and repaired in a part of the plant apart from the finishing room, an indeterminate number did go through that room.

In normal production, a very large percentage of cabinets were reworked one or more times before final inspection for defects not attributable to painting materials. All of these factors and the letters next referred to indicate cause for the confusion which was found in the plant and its records by accountant Andrews, and works manager Hessman.

The letters of complaint written by Universal to Bendix are illustrative of delays and stoppages of production in Universal's plant from May, 1947, to January, 1948, not attributable to duPont. The letters of August 6, 1947, November 7, 1947, and January 28, 1948, were written after the "peeling" difficulties had been solved, and when there were no current complaints of finishing defects. According to these letters, in May, 1947, a lay-off of employees was charged to Bendix's indecision in the selection of color and grille cloth. In August, 1947, the assembly line of Bendix cabinets was temporarily shut down due to congestion in the plant resulting from Bendix's rejection of work-in-process and finished cabinets. In January, 1948, Bendix was charged with a continued failure to cooperate in the matter of inspection, acceptance and delivery of production since April of the preceding year.

These letters show a state of affairs wholly inconsistent with the contention of Universal that the confusion in its plant, the congestion of the finishing facilities, and the interruption of its production was chargeable almost entirely to the paint failures. The existing causes and conditions, as viewed by Universal at the times mentioned are set out so plainly, directly, and strongly that we deem it unnecessary to make further comment on the letters.

The explanation given as to why Universal did not keep a record of the entire number of peeled cabinets is not clear and satisfactory. Its procedure after July 15 was not in accord with notice of its intention to keep a strict account of the defendant's liability. It is not easy to understand why Universal could keep a record of the expenses and cost of reworking the Bendix cabinets returned in June, and a special job and ledger account of the cost of refinishing cabinets with bad lacquer prior to June 12, 1947, and yet did not keep such a record of peeling failures after July 14th.

There is no accurate record of the number of cabinets involved in "printing," nor any clear explanation why the printing was confined to the tops of the cabinets. The costs required to refinish the latter and the amount of time required for refinishing are not stated. In fact, it was not shown that the failure of duPont's materials was responsible for the "printing." At the time of the printing, Type 3 lacquer was being supplied to Universal, and had been supplied and satisfactorily used since July 22 on all cabinets, including Westinghouse.

The inventory of July 12th showed 1,864 cabinets with bad lacquer. In that number were included some that peeled on being refinished after washing. There was no regular production of new cabinets during the vacation period from June 28th to July 12th. On July 12th, a small number were sealed and lacquered. Regular production was resumed on Monday, July 14th. A witness for Universal "estimated" that between 500 and 800 peeled after vacation up to the final end of "peeling." A representative of duPont, present

in the plant, recorded that of about 600 cabinets lacquered on July 14th, a total of only 35 were rejected for "peeling." According to duPont's evidence, all sealing and lacquering were suspended on July 15th, and after certain changes of ingredients had been made in the painting material, normal production was resumed on the following day. After the re-introduction of Type 3 lacquer in the plant, peeling of refinished cabinets was not chargeable to duPont materials.

There was a wide difference in the estimate of Universal and the actual count of duPont of defective cabinets after vacation. Of course, the amount of the actual, direct cost of refinishing depended upon the number.

The claim of Universal is based on two different methods of measuring its losses. For the month of June, 1947, it is based on Universal's ledger charges for excess costs of direct labor and material and overhead expenses in refinishing peeled cabinets, plus $20,400 for "lost effort." For the six months' period from July 1, 1947, to December 31, 1947, its damages are sought to be measured by the extent to which cost of production exceeded its income from sales of its products for that period.

If 3,131 peeled cabinets, the number stated in the bill of particulars, had been destroyed or damaged their total sales value was only about $140,895, the amount Universal would have received from its customers at a price of $45 each, but for lacquer failure. It was obviously unwise to junk them. Since the unit cost of refinishing the 1,864 peeled prior to July 14, 1947, was approximately $18 per cabinet, according to Universal's ledger records, the total cost of refinishing 3,131 would have been but $56,358.

The evidence does not show that conditions surrounding the business of Universal during the last half of the year, 1947, were comparable other than in volume of sales with the two periods of 1948, selected by accountant Andrews. The receipts from sales from April 1 to September 30, 1948, was $2,444,253, and the production costs $2,276,352. In the period from June 1 to November 30, 1948, the sales were

$3,050,061, and the costs $2,826,262. Universal's sales and other income from July 1 to December 31, 1947, amounted to $1,833,947.19. In the same period its production costs were $2,661,629.09. Consequently, there was a loss during that period of $777,681.90. After charging itself with losses for which it did not seek to hold duPont responsible, there remained an adjusted loss of $606,693.71.

There was proportionately an even greater loss on the 81-C's returned by Bendix. The total cost of their production and repair was $284,413.15, while their selling price was $124,385.74, a net loss of $160,027.41. Thus, the sale price was about 43% of cost.

As we have seen, conditions in 1948 differed from those in 1947, in personnel, in the kind and number of cabinets manufactured and the methods of inspection. The 1947 profit and loss statement for March, April and May was not fairly representative of the earning capacity of Universal for the five months of its business operations prior to July 1, 1947. The financial statements did not of themselves establish the cause of the loss they evidenced. They only showed the result of Universal's operation during the selected periods. They form no basis for an intelligent and probable estimate of the loss occasioned by the defendant alone.

There is no claim in the bill of particulars that the rental value of Universal's plant bore any relation to the operations of Universal after February 1, 1947. The lease agreement of 1945 was not a strictly rental contract, evidencing true rental value. There were so many factors connected with production costs and compensation for personnel that Andrews was unable to determine what should have been allocated solely as rental.

While duPont might have foreseen that some damage would result from the supply of unsuitable paint materials, it is difficult to understand how it could have reasonably foreseen that the paint finishing failures on the occasions mentioned would probably cause an interrpution of the nor-

mal operations of Universal's plant for six and one-half months, and a consequent loss of approximately $100,000 per month.

The confusion in Universal's factory was plant-wide, due to increased burdens put on the plant as a whole. There was no way to ascertain whether one or more factors created the confusion, or only a part, or whether all combined were responsible. It was impossible, under the evidence, to segregate or allocate, with any degree of reasonable certainty, to one or several specific factors, its or their share of responsibility for the damages sustained. Whatever part the several factors may have played in producing the damage complained of, the proportion to which duPont's wrong contributed as a direct and proximate result is left purely to speculation and conjecture.

Instruction No. 5, although adroitly drawn, is much too long and involved. It is argumentative, repetitious and misleading. Its fifth paragraph stated one measure of damages and the seventh another. It failed to direct proper consideration to intervening factors of damages not chargeable to the defendant. It referred to evidence without probative value, and, on the whole, invited the jury to speculation and conjecture.

It follows that, for the errors indicated, the judgment complained of should be reversed, and a new trial awarded. We do not deem it necessary, therefore, to discuss the remaining assignments of error, which deal with questions not likely to arise upon a new trial. Since we are of opinion that the plaintiff is entitled to a recovery against the defendant, and that the only uncertainty is as to the true amount, it only remains for us to declare the proper method of proving and measuring the damages.

Under the peculiar facts and circumstances of this case, it is our view that the only practical way of ascertaining, with reasonable certainty, the extent of the liability of the defendant is to measure it by the amount of the reasonable costs of refinishing all cabinets shown to have been de-

fective because of the failure of paint finishing materials furnished by duPont.

Accordingly, and for the reasons stated, the judgment of the trial court is reversed, the verdict of the jury set aside, and the case remanded for a new trial solely upon the quantum of damages. Upon that trial, the damages are to be measured by the direct cost of all labor and material required to refinish cabinets defective because of the failure of paint finishing materials, plus fair and reasonable overhead expenses, that is factory and administrative expense, properly chargeable to the refinishing operations during the reasonable time required for refinishing.

*Reversed and remanded.*