## Richmond

UNITED CONSTRUCTION WORKERS, AFFILIATED WITH UNITED MINE WORKERS OF AMERICA, DISTRICT 50 UNITED MINE WORKERS OF AMERICA, AND UNITED MINE WORKERS OF AMERICA v. LABURNUM CONSTRUCTION CORPORATION.

April 20, 1953.

Record No. 3989.

Present, All the Justices.

The opinion states the case.

*James Mullen, Walter E. Rogers, Crampton Harris, M. E. Boiarsky, Willard P. Owens,* for plaintiffs in error.

*Archibald G. Robertson, Francis V. Lowden, Jr., T. Justin Moore, Jr., George E. Allen, Jr.,* for defendant in error.

EGGLESTON, J., delivered the opinion of the court.

This is a tort action instituted in December, 1949 by Laburnum Construction Corporation, sometimes hereinafter referred to as the plaintiff, or Laburnum, against United Construction Workers, Affiliated with United Mine Workers of America, District 50 United Mine Workers of America, and United Mine Workers of America, sometimes hereinafter called the defendants, for recovery of compensatory and punitive damages in the aggregate sum of $500,000.

The notice of motion for judgment charges that in July, 1949, while the plaintiff was engaged in certain construction work in Breathitt County, Kentucky, pursuant to contracts with Pond Creek Pocahontas Company and Spring Fork Development Company, the defendants' agents came to the site of the work and demanded that the plaintiff's employees become members of the United Construction Workers, that plaintiff recognize that organization "as the sole bargaining agent" for its employees on such projects, and threatened that if the plaintiff and its employees refused to comply with these demands it would not be allowed to continue with its work on these projects; that upon the refusal of the plaintiff and its employees to yield to these demands and threats the defendants' agents, by "a series of violent, malicious and unlawful acts," so threatened and intimidated the officers and employees of the plaintiff that it was unable to continue with the construction projects and was compelled to abandon them. It was further alleged that as the direct and proximate result of such acts of the defendants' agents the plaintiff was greatly damaged and injured "in and about its property and reputation," its profitable business connections were lost and destroyed, and it was deprived of large profits which it would otherwise have earned.

Each of the defendants filed a plea of not guilty and grounds of defense, denying all of the material allegations of the notice of motion for judgment.

After a protracted trial the jury, by their verdict, found all of the defendants "jointly and severally liable" and awarded the plaintiff "compensatory" damages of $175,437.19, and "punitive" damages of $100,000, making a total of $275,437.19. The defendants filed a motion to set aside the jury's verdict as contrary to the law and the evidence and grant a new trial, assigning numerous errors during the proceedings. While this motion was pending the defendants filed a motion to dismiss the plaintiff's notice of motion for judgment and enter a final judgment for the defendants, on the ground that the court was "without power, authority and jurisdiction to hear and determine the issues in this action because such determination would be repugnant to and in violation of the Labor Management Relations Act, 1947 (61 Stat. 136, ch. 120, Section 1, *et seq.,* Public Law 101), and to Article I, Section 8, of the Constitution of the United States." These motions of the defendants were

overruled and judgment was entered on the verdict. We granted writ of error.

## JURISDICTION

■ We shall first deal with the assignment of error which challenges the authority and jurisdiction of the lower court to hear and determine the issues in this action. The contention is that the conduct of the defendants' agents upon which the plaintiff's action is grounded—that is, coercing plaintiff's employees to become members of one of the defendant unions—constitutes an "unfair labor practice" in violation of the National Labor Relations Act of 1935 (49 Stat. 449, 29 U. S. C. A., § 151, *et seq.*), as amended by the Labor Management Relations Act of 1947 (61 Stat. 136, 29 U. S. C. A., § 141, *et seq.*); that that Act "established a single paramount administrative authority for the redress and prevention" of such practice; and that although the Act does not "provide for damages to the employer" because of such practice, yet the State courts are deprived of jurisdiction to entertain "any action for damages based upon such conduct."

The defendants argue that the record shows that Laburnum is a Virginia corporation, with its home office in Richmond, Virginia; that it engages in industrial construction work in several States; and that at the time of the acts complained of it was engaged in construction work for two large coal producers with mines in Kentucky and West Virginia, whose output was being shipped in interstate commerce. Hence, it is said, the labor dispute in which the plaintiff became involved and out of which its cause of action arose, so affected interstate commerce as to be within the purview of the Act.

Section 1 of the National Labor Relations Act of 1935 (49 Stat. 449, 29 U. S. C. A., § 151, *et seq.*), as amended by the Labor Management Relations Act of 1947 (61 Stat. 136, 29 U. S. C. A., § 141, *et seq.*), hereinafter referred to as the "Act," recites that its "purpose and policy" are "to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor

and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce." (61 Stat. 136, 29 U. S. C. A., § 141.)

Under section 7 of the Act, "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities * * *." (29 U.S.C.A., § 157.)

Section 8 of the Act provides that certain conduct on the part of an employer or a labor organization shall constitute "an unfair labor practice." Under its terms, "(b) It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: * * *." (29 U.S.C.A., § 158.)

Section 10 of the Act provides these remedies through proceedings before the National Labor Relations Board and in federal district and appellate courts: The Board is empowered to prevent unfair labor practices affecting commerce (§ 10(a); 29 U.S.C.A., § 160(a)), and to that end may "issue and cause to be served upon" a person charged with any such practice "a complaint stating the charges in that respect" (§ 10(b); 29 U.S.C.A., § 160(b)), conduct a hearing upon the charges and, upon a finding that they have been sustained, issue an order requiring such person to cease and desist from such unfair labor practice (§ 10 (c); 29 U.S.C.A., § 160(c)). A right of appeal from a final order of the Board is afforded to an appropriate United States circuit court of appeals (§ 10(f); 29 U.S.C.A., § 160(f)). Pending a hearing of the matter before it the Board may petition an appropriate United States district court for, and such court may grant, an "appropriate temporary relief or restraining order." (§ 10(j); 29 U.S.C.A., § 160(j).)

We may assume, without deciding, that the acts of the defendants so affected interstate commerce as to come within the purview of the Act and, at the instance of the plaintiff, could have been dealt with in the manner there prescribed. But it does not follow that that was the only redress open to the plaintiff. It did not seek relief because the acts of the defendants' agents were unfair labor practices, nor is its present case predicated

upon the Act. It sought damages for a completed common-law tort for which admittedly the Act affords no redress.

It is settled by recent decisions of the Supreme Court of the United States that by the passage of the National Labor Relations Act of 1935 (49 Stat. 449, 29 U.S.C.A., § 151, *et seq.*), as amended by the Labor Management Relations Act of 1947 (61 Stat. 136, 29 U.S.C.A., § 141, *et seq.*), Congress has occupied and closed to the States the field of "regulation of peaceful strikes for higher wages" in industries engaged in interstate commerce. *International Union, etc.* v. *O'Brien,* 339 U. S. 454, 457, 70 S. Ct. 781, 783, 94 L. ed. 978; *Amalgamated Ass'n., etc.* v. *Wisconsin Employment Rel. Bd.,* 340 U. S. 383, 390, 71 S. Ct. 359, 363, 95 L. ed. 364.

But this is not to say that by the passage of the Act the courts of the several States have been deprived of their traditional power and jurisdiction to deal with unlawful conduct committed within their respective territorial limits during the course of a labor dispute which may affect interstate commerce. The Supreme Court has repeatedly held that an "intention of Congress to exclude states from exerting their police power must be clearly manifested." *Allen-Bradley Local, etc.* v. *Wisconsin Employment Rel. Bd.,* 315 U. S. 740, 749, 62 S. Ct. 820, 825, 86 L. ed. 1154, and cases there cited. As was said in *Kelly* v. *State of Washington,* 302 U. S. 1, 10, 58 S. Ct. 87, 92, 82 L. ed. 3," * * * the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.' "

In *Erwin Mills, Inc.* v. *Textile Workers Union of America,* 234 N. C. 321, 67 S. E. 2d 372, it was held that the federal Act did not deprive the State court of the power by appropriate action to protect persons and property from threatened unlawful acts of violence committed during the course of a strike or labor dispute and injurious to the rights of the State's citizens. To the same effect are, *Williams* v. *Cedartown Textiles,* 208 Ga. 659, 68 S. E. 2d 705; *International Molders, etc.* v. *Texas Foundries,* Tex. Civ. App., 241 S. W. 2d 213; *State* v. *Thatch,* 361 Mo. 190, 234 S. W. 2d 1; *Rice & Holman* v. *United Elec. Radio & Mach. Wkrs.,* 3 N. J. Super. 258, 65 A. 2d 638.

The determination of the present question is governed by the

same principles. While the Act provides a remedy to restrain the commission of acts constituting unfair labor practices, there are no words which indicate that such remedy is exclusive, or that the Act was designed to deprive an employer or his employees of the common-law right of action in a State court for acts of violence or intimidation which may constitute unfair labor practices. Nor does the exercise by the State of its jurisdiction in enforcing such cause of action conflict with any of the provisions of the Act, or in any way impinge upon the rights thereby protected.

Upon substantially this reasoning the Supreme Court of Alabama in *Russell* v. *International Union, etc.,* — Ala. —, 64 So. 2d 384 (decided March 13, 1953), upheld the right of the State court to entertain an action for damages against a labor union for malicious acts of violence and threats of personal injury by the union's agents which prevented "plaintiff from engaging in his employment," although such conduct on the part of the union's agents constituted an unfair labor practice under the federal Act.

The motion to dismiss was properly overruled.

The remaining assignments of error raise these basic questions:

(1) Is the finding that Laburnum was entitled to an award of damages against the defendants supported by the law and the evidence?

(2) Is the quantum of the compensatory and punitive damages supported by the law and the evidence?

(3) Did the lower court correctly rule on other matters arising during the course of the trial?

## LIABILITY OF THE DEFENDANTS

Laburnum Construction Corporation was organized under the laws of Virginia in 1937 and has its principal office in Richmond. Since 1942 its president has been A. Hamilton Bryan. It specializes in industrial construction and during the ten years preceding the events with which we are concerned it had successfully performed contracts amounting to an average of about $2,000,000 per year.

On April 15, 1947, the plaintiff entered into a contract with Richmond Building & Construction Trades Council, an affiliate of the American Federation of Labor, whereby it agreed to

employ, if obtainable, only members of that union when work-ing in an area over which an affiliate of that union had juris-diction.[1]

During the period from September 6, 1947 to December 1, 1949, the plaintiff performed work in West Virginia and Ken-tucky for Pond Creek Pocahontas Company, Island Creek Coal Company, and their subsidiary companies, under twelve separate contracts amounting to more than $650,000, from which it derived an annual profit slightly over $25,000. These two coal companies and their subsidiaries, including the Spring Fork Development Company, comprise the third largest commercial coal producing unit in the United States and the largest in the West Virginia and Kentucky coal fields. They usually have considerable construction work in progress on their properties.

The relationship between the plaintiff and these companies was based upon personal friendship as well as upon a record of business integrity and performance. Bryan, the president of Laburnum, was a friend of J. D. Francis and Raymond E. Sal-vati, president and vice-president in charge of operations, respectively, of both companies. Since June, 1949 Salvati has been president of both companies under a common management.

In October, 1948, the two coal-producing companies deter-mined to open a mine in Breathitt county, Kentucky, and Bryan was asked to undertake the building of the preparation plant there. Because of the undeveloped condition of the roads and lack of living accommodations for the laborers, Bryan was told that if Laburnum would undertake the project it would be awarded additional work which would be required for the oper-ation of another mine in Breathitt county, amounting to more than $600,000, on the basis of cost plus a fee of five per cent.

On October 28, 1948, Pond Creek Pocahontas Company awarded the plaintiff a contract for construction of the prepa-ration plant on the basis of cost plus a fee of five per cent, the total fee not to exceed the sum of $12,000. The estimated cost of the project was $200,000. Work on this project was com-menced November 1, 1948, and was approximately ninety-five per cent completed when it was interrupted on July 26, 1949. Pursuant to their agreement the coal companies also awarded Laburnum several projects included in the additional work to which reference has been made.

---

[1] This agreement was executed prior to the effective date of the "Right to Work Statute." Acts 1947, Ex. Sess., ch. 2, p. 12; Code of 1950, § 40-68 ff.

Upon commencing the work in Breathitt county, Laburnum, in compliance with its agreement with Richmond Building & Construction Trades Council, procured skilled laborers through the nearest local affiliates of the American Federation of Labor. With the knowledge and consent of these affiliates it employed local unskilled laborers who were not members of any labor organization.

Laburnum proceeded with its work on these several projects without trouble until July 14, 1949, when William O. Hart, speaking from Pikeville, Kentucky, telephoned Bryan who was in Richmond. According to the testimony of Bryan, which was accepted by the jury, Hart identified himself as a "field representative of the United Construction Workers and District 50 of the United Mine Workers of America," working under David Hunter, "Regional Director of Region 58 of United Construction Workers and District 50," with headquarters in Pikeville. Hart told Bryan that he was familiar with the work which Laburnum was doing and about to do in Breathitt county, that the plaintiff was "working in United Mine Workers territory," and that he (Hart) would close down this work unless the plaintiff recognized the United Construction Workers in the employment of its workers. Bryan told Hart of Laburnum's agreement with the American Federation of Labor affiliate at Richmond, under which it was to employ members of that union, and that consequently it would not be able to comply with Hart's demand and make an agreement with the United Construction Workers. Hart replied that he was going "to take over" the plaintiff's work, that he intended to "organize" all of its workers, "including the carpenters, electricians, pipefitters, ironworkers, millwrights, laborers, and everybody else," and that if the plaintiff failed to make an agreement "recognizing the United Construction Workers, he (Hart) would close down" all of the plaintiff's work in Breathitt county, as had been done in other instances within his (Hart's) territory.

According to Bryan, during this conversation Hart said nothing as to any of Laburnum's laborers being dissatisfied with their wages or working conditions, but based his statements on the fact that Laburnum was working in United Mine Worker's territory and must recognize the United Construction Workers, the latter's affiliate. Just before concluding this telephone

conversation Bryan requested Hart to communicate with him before he took any other steps, and Hart agreed to do so.

Bryan immediately telephoned Cecil M. Delinger, his superintendent at the Kentucky job site, about his conversation with Hart. Delinger told Bryan that he knew nothing of any labor trouble, or any threatened complaints.

On Monday, July 25, about 7:30 p.m., Delinger telephoned Bryan that he had been informed that on the next day, at noon, the United Construction Workers were coming to the job site with a large group of men, that they would be armed, and would stop the plaintiff's employees from working on the projects.

It was then too late for Bryan to catch a train for arrival at the job site by noon the next day, so with one of his employees he set out for Kentucky that night in a company truck, reaching Huntington, West Virginia, about 7:00 a.m. on Tuesday, July 26. Bryan then undertook to call Hart at Pikeville, Kentucky, and was informed that he was not there but that he might speak to Hart's "boss," David Hunter, regional director of District 50 United Mine Workers of America, and regional director of United Construction Workers. Bryan requested Hunter to direct Hart not to interfere with the plaintiff's workmen before Bryan had an opportunity to talk with Hart at the job site. Hunter stated that he would try to get the message to Hart.

Having been delayed by trouble with his truck Bryan did not reach the job site until about 3:00 p.m. on the same day. When he arrived there he found that all work on the several projects in which his men were engaged had stopped. It developed that about noon on that day Hart had arrived at the job site accompanied by a crowd variously estimated at from 40 to 150 men. There is evidence that this was "a very rough, boisterous crowd," that some of the men used abusive language, that some were drunk, and that some carried guns and knives.

There is evidence on behalf of the plaintiff that when Hart and his men reached the "schoolhouse site" upon which some of the plaintiff's skilled laborers were working, Hart demanded that these workmen join the United Construction Workers. When several of the Laburnum workmen informed Hart that they were members of the American Federation of Labor, Hart replied, "God damn you, if you work here you are going to join the United Construction," or else "we will kick you out of here."

Hart and his men went to the coal preparation plant and told the Laburnum workers there that he was taking over the job and that the Laburnum workers would have to "join up with the United Construction Workers." He accosted other employees of the plaintiff at another site where he repeated his threats that he would "take over" the job unless they joined the union which he represented. Some of the plaintiff's employees yielded to these threats and agreed to join Hart's labor organization, while others refused to do so.

It is true that Hart's version of these incidents is quite different. He denied that he undertook to coerce the plaintiff's employees into joining his union, or that he told them that they could not work unless they did so. In short, his story is that he went to the job site for the purpose of organizing the unskilled laborers who were unorganized and not members of any union, and to "represent" other employees of the plaintiff who were dissatisfied with their wages and working conditions. He related that some of the plaintiff's employees, including both the skilled and unskilled laborers, voluntarily signed up with the United Construction Workers.

The verdict of the jury has, of course, resolved this conflict in favor of the plaintiff.

When Bryan arrived at the job site and was informed of what had happened, he talked to Hart and reminded him of their telephone conversation of July 14, when Hart had promised to let Bryan hear from him before he undertook to stop the work. Hart denied that he had had any such understanding and repeated to Bryan that the latter was in United Mine Workers' territory, that he (Hart) was "taking over" for the United Construction Workers regardless of the fact that the majority of the Laburnum employees were members of the American Federation of Labor, or had made application to join it.

According to Bryan, Hart further admitted that he had received Bryan's message sent through David Hunter that morning, but asserted that he "had already made all his plans and arrangements and couldn't stop them." He boasted to Bryan, "I bet you $500 right now that you will never finish your job unless you use United Construction Workers' men," adding, "Nobody has ever been able to buck the United Mine Workers yet, and you can't do it either."

There is ample evidence to support the finding that because

of the insolent and abusive language and threats of Hart and those accompanying him, the Laburnum employees, who were greatly outnumbered, were intimidated and afraid to proceed with their work.

After July 26 Bryan undertook to persuade his employees to resume their work. On the next day some of the workers returned to the job site, but were again confronted by representatives of the opposing labor organizations who repeated their abusive threats, and consequently the plaintiff's employees were afraid to go back to work. There is further evidence that Bryan continued his efforts to retrieve the situation. He sought police protection, which was denied him; he attempted to hire new men, but they were afraid to work with him after what had happened.

On behalf of the defendants there is evidence that some of the Laburnum employees refused to return to work because Hart had posted picket signs on the job site and these employees refused to pass these signs or cross the so-called "picket lines." But there is ample evidence to support the finding that the plaintiff's employees refused to resume their work because of the threats and conduct of Hart and his associates.

Bryan talked with Hart again at the job site on August 1, and, as he says, Hart "left no doubt in anybody's mind that he was going to have people to stop any men from working who tried." "He continually threatened to bring a large crowd of people there from Beaver Creek and other places to stop us from working if any of our people went to work. He said he would do that unless we signed a paper recognizing his organization as the representative of the laborers." Bryan replied that he "wouldn't do it and couldn't do it" because of his prior obligation to another labor organization. Moreover, Hart threatened that if the Laburnum men "went back to work he was going to close down the mine operations by stopping the United Mine Workers from working for Pond Creek."

On August 3, 1949, Bryan reported the whole situation to the officials of Pond Creek Pocahontas Company and Island Creek Coal Company. In the meantime these coal producers had become alarmed lest the disturbance spread to their own employees who were members of the United Mine Workers and bring on a stoppage of their mining operations. Consequently, on August 4, the coal companies, because of the dispute in which

the plaintiff had become involved with representatives of these labor organizations, canceled the construction contracts with Laburnum which were then in progress.

Hoping, nevertheless, to save the situation, on August 5 Bryan talked with David Hunter at the latter's office in Pikeville, Kentucky. But Hunter refused Bryan's plea for help and told him that Hart was working under his (Hunter's) direction and could have brought 6,000 men to the job side, if that had been necessary to stop the Laburnum employees from working.

On May 15, 1950, Bryan called on Hunter at the latter's office at Pikeville and told him that Laburnum was contemplating submitting a bid on other work in Mingo county, West Virginia, and inquired as to Hunter's attitude should Laburnum employ members of the American Federation of Labor on that project. Hunter replied that Laburnum would be expected to use members of the United Construction Workers on the project. Bryan testified that during this conversation Hunter admitted that Hart's conduct at the site of the work in which the Laburnum company had been engaged during the preceding July was "pursuant to his (Hunter's) orders."

After the violent events of July, 1949, Pond Creek Pocahontas Company and Island Creek Coal Company abandoned the award of the additional work upon a cost plus five per cent basis which they had promised the Laburnum company. The coal companies invited bids upon this proposed construction, but Laburnum was unsuccessful in all of its bids for such work. The officials of the coal companies expressed their high regard and sympathy for Bryan, but explained that they could not run the risk of having the defendant unions shut down the mining operations because of the unions' differences with Laburnum.

Hence, there is ample evidence to sustain the finding that the acts and conduct of Hart in July, 1949, ratified by Hunter, disrupted the business relationship between Laburnum, Pond Creek Pocahontas Company and Island Creek Coal Company, and entitled Laburnum to an award of damages against Hart's principals.

United Mine Workers of America is a labor organization with approximately 650,000 members who are primarily engaged in mining and processing coal at the mines.

District 50 United Mine Workers of America has a membership of 112,000, which is largely made up of workers who convert

coal into chemical constituents, such as dyes, drugs, plastics, etc. A part of its charter fees, initiation fees and dues is paid to the United Mine Workers of America. According to defendants' brief, "Its members are part of UMWA, but retain their identity, membership rights and privileges at all times as members of District 50." In other words, District 50 is an arm or branch of the United Mine Workers of America.

United Construction Workers, Affiliated with United Mine Workers of America, is a "division" of District 50 United Mine Workers of America, and has approximately 46,000 members who are, according to its "Rules," "employed in and around construction and allied industries, also fabricating plants, motor transportation, and maintenance and service industries." As defendants' brief says, its members "are a part of UMWA, but retain their identity, membership rights and privileges at all times as members of the UCW Division of District 50."

Thus, while the defendants' brief insists that "members of District 50, UCW and UMWA are not members of one organization," a fair deduction from the record is that District 50 is a component part of United Mine Workers of America, or at least its agent in organizing workers in businesses other than that of mining coal. Admittedly, Hart was employed by District 50 United Mine Workers of America and assigned to work as "field representative" under Hunter, a "regional director." It is also admitted that in "that capacity" Hart served both District 50 United Mine Workers of America and United Construction Workers. As we interpret the brief of the defendants, there is no serious contention that any one of the defendant organizations should be freed of liability, if any liability were found to exist, for the acts of Hart and his associates upon which the plaintiff's cause of action is predicated.

## DAMAGES

 With the consent of counsel the court instructed the jury that they should specify separately the amount of compensatory and punitive damages, if any, allowed. By their verdict the jury awarded the plaintiff compensatory damages of $175,437.19 and punitive damages of $100,000, or a total of $275,437.19.

The alleged wrongful acts upon which the verdict is predi-

cated having been committed in Kentucky, the correctness of the award must, of course, be tested by the law of that State.

In Kentucky, as in Virginia, damages directly and proximately caused by wrongful conduct chargeable to the defendants are collectible, provided they are not uncertain, speculative, or remote. Loss of future profits by the interruption or destruction of an established business, if capable of reasonable ascertainment, may be recovered. *American Bridge Co.* v. *Glenmore Distilleries Co.,* 32 Ky. L. Rep. 873, 107 S. W. 279; *Kentucky Heating Co.* v. *Hood,* 133 Ky. 383, 118 S. W. 337, 22 L. R. A., N. S., 588; *E. I. duPont deNemours & Co.* v. *Universal Moulded Products Corp.,* 191 Va. 525, 568-573, 62 S. E. 2d 233, 253-255.

### Compensatory Damages

As the result of the acts of the defendants and their agents, Laburnum claimed these items of compensatory damages:

1. Damage from loss of fee on contract for construction of 25 dwellings . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ 534.19
2. Damage from loss of fee on work in connection with construction of schoolhouse . . . . . . . . . . . . . . 319.67
3. Damage from loss of fee in connection with work for installation of asbestos shingles on said 25 dwellings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250.00
4. Damage from loss of fee in connection with work for installation of concrete foundations for coal preparation plant for No. 2 mine . . . . . . . . . . . . . . 1,250.00
5. Damage from loss of fee on other additional work in Breathitt county, Kentucky, amounting to approximately $542,500, which Pond Creek Pocahontas Company had agreed to have Laburnum Construction Corporation handle on a basis of cost plus a fee of five (5) per cent . . . . . . . . . . . . . . . . . 27,125.00
6. Damage by reason of the destruction of the business relationship and connection which Laburnum Construction Corporation had built up and developed with Pond Creek Pocahontas Company, Island Creek Coal Company and their associated and subsidiary companies . . . . . . . . . . . . . . . . . . . . . . . 120,000.00
7. Damage to plaintiff's reputation . . . . . . . . . . . . . . . 100,000.00

Since, as the evidence shows, construction of the coal prepara-

tion plant, under the contract of October 28, 1948, was ninety-five per cent complete when the work thereon was interrupted, and Laburnum had been paid the stipulated maximum fee of $12,000, no damage was claimed with respect to this project.

The first five items of the alleged damages are for profits which the plaintiff claims it would have earned on additional work which was promised to it by the coal companies on a cost plus five per cent fee basis, and which it would have carried out had the business relationship not been interrupted by the wrongful conduct of the defendants' agents.

Items Nos. 1 and 2 are for the loss of profits on contracts for additional work which was awarded to, and had been partially completed by, Laburnum when the work was interrupted.

Items Nos. 3 and 4 are for the loss of profits for additional work which had been awarded to Laburnum, but work on which was prevented and never commenced because of the alleged acts of the defendants.

Item No. 5 is for the loss of profits on the remaining additional work which Laburnum says had been promised but not actually awarded to it by the coal companies, and which work the plaintiff says would have been awarded to and completed by it but for the interruption of the business relationship through the acts of the defendants.

The construction of twenty-five dwellings referred to in Item No. 1, was about eighty-five per cent complete when work thereon was stopped. Up to that time Laburnum had been paid $1,965.81 of the agreed maximum fee of $2,500, leaving a balance of $534.19, which the plaintiff's evidence shows it would have earned by way of profit if it had been permitted to complete the project.

The construction of the schoolhouse, referred to in Item No. 2, was from eighty to eighty-five per cent complete when work thereon was stopped. The project was completed by another contractor at a cost of $3,338, and the plaintiff's evidence shows that if it had been allowed to complete the work it would have earned the agreed fee of five per cent of this amount, or $166.90, instead of $319.67 claimed in its statement of damages.

The project referred to in Item No. 3, for the installation of asbestos shingles on twenty-five dwellings was awarded to Laburnum on a cost plus five per cent fee basis and work thereon

was to commence in August, 1949. The estimated cost of the project was $5,000. The plaintiff's evidence shows that but for the interruption of the business relationship it would have performed this work and earned the agreed fee of $250.

The project for the installation of the concrete foundations for the coal preparation plant, referred to in Item No. 4, was awarded to Laburnum in July, 1949, at an estimated cost of $25,000, upon a cost plus five per cent fee basis. But Laburnum was unable to proceed with that project because, as Salvati testified, its employees, by reason of the acts of the defendants' agents, were "run off the job there." The evidence on behalf of the plaintiff is that it would have earned the agreed fee of $1,250 but for the interruption of the work.

Although there is argument to the contrary in defendants' brief, each of the Items Nos. 1, 2, 3 and 4 was within the purview of Instruction No. 9, which submitted to the jury the plaintiff's claim for damages.

Item No. 5 embraces the plaintiff's claim for profits on the remaining additional work which had been promised it by the coal companies, although no part of this work had actually been awarded. The evidence on behalf of the plaintiff tends to show that but for the interruption of the business relationship this work would have been awarded to and performed by it at an estimated cost of $542,500, on a cost plus five per cent fee basis, and that had it been allowed to proceed with the work it would have earned the percentage fee of $27,125.00.

The defendants contend that the evidence with respect to Item No. 5 fails to support the claim that this work was actually promised Laburnum by the coal companies, or if promised, that the alleged acts of the defendants' agents prevented the commencement of the work. Moreover, the defendants say, the alleged loss of profits from this supposed "promised work" is so speculative and uncertain as to be incapable of reasonable ascertainment.

There is evidence on behalf of the plaintiff that in September, 1948, it has been advised that these coal companies were about to embark on a definite building program of considerable proportions. Bryan testified that at the time of the execution of the contract for the construction of the coal preparation plant on October 28, 1948, because of the unusual difficulties in connection with that undertaking, Salvati, who was then vice-president in

charge of operations of Pond Creek Pocahontas Company, verbally promised him that Laburnum would be given additional work in Breathitt county, amounting to approximately $600,000, and that this was to be done on a cost plus five per cent fee basis. Salvati identified the list of work, containing twelve items totaling $617,500, which had been approved by the board of directors of his company and referred to by Bryan. He likewise corroborated Bryan's testimony that it was agreed Laburnum would be awarded this additional work.

Pursuant to this arrangement Laburnum actually performed a part of the work referred to in the testimony of Bryan and Salvati. It constructed a telephone line at a cost of approximately $4,600, on the basis of cost plus fee of five per cent. As part of this additional work it undertook and partly completed the projects referred to in Items Nos. 1 and 2 of the plaintiff's list of damages. It was awarded the projects referred to in Items Nos. 3 and 4 of the plaintiff's damages, both on a cost plus five per cent fee basis, although, as has been said, work on these latter two projects was never actually commenced because of the trouble which arose.

Salvati testified that the balance of the work referred to in the program and amounting to $542,500, would have been awarded to Laburnum on a cost plus five per cent fee basis if its organization and equipment had still been at the job site ''and if the United Mine Workers of America and its branches had not threatened to interfere with the work.''

It is true, as is argued by the defendants, that there is evidence which tends to refute the plaintiff's claim that it had been promised or would have been awarded this additional work. They point to the fact that since August 4, 1949 the coal companies have actually awarded contracts for a relatively small portion of this work. There is also evidence that subsequently Laburnum submitted a conditional bid for a portion of this work, which was rejected. But this conflict in the evidence merely presented a question of fact which the jury's verdict has resolved in favor of the plaintiff. We think there is sufficient evidence to support the finding that but for the disruption of the business relationship by the acts of the defendants' agents the plaintiff would have been awarded and allowed to proceed with this additional work.

We are of further opinion that the plaintiff's loss of profits

from this promised work has been established with reasonable certainty. This was not a new and unpredictable venture. On the contrary, the work had been approved by the board of directors of Pond Creek Pocahontas Company, the cost plus fee basis had been agreed upon, and the amount of the estimated profits on the proposed construction was, therefore, reasonably ascertainable.

In Item No. 6 the plaintiff claimed $120,000 damages for the alleged permanent destruction of its business relationship with Pond Creek Pocahontas Company, Island Creek Coal Company, and their subsidiaries. In support of this item the plaintiff showed that it had been doing business with these companies for a period of approximately two years preceding the disruption of the relationship, at an annual profit of about $25,000; that because of the disturbance in July, 1949, in which the plaintiff incurred the hostility of the defendant unions, the coal companies which employed in their mining operations members of one of the unions, permanently broke off their business relationship with the plaintiff; and that as a result of this the plaintiff lost profits which it would have earned had the relationship not been disturbed.

We may assume without deciding that the evidence supports a finding that the conduct of the defendants' agents was the proximate cause of a permanent disruption of the profitable relationship between the plaintiff and these coal companies. The crucial inquiry is, does the evidence support a finding that the plaintiff is entitled to substantial damages by way of loss of profits as the result of such wrongful acts?

"Where a regular and established business is injured, interrupted, or destroyed, the measure of damages is the diminution in value of the business by reason of the wrongful act," measured by the loss of the usual profits from the business. 25 C. J. S., Damages, § 90-b, p. 633.

In *E. I. duPont deNemours & Co.* v. *Universal Moulded Products Corp., supra* (191 Va., at pages 569-573, 62 S. E. 2d, at pages 253-255), there is a full discussion of the principles upon which damages for loss of profits from the interruption of an established business are to be measured. We there stated the generally accepted rule that for such damages to be recoverable they "must be established with reasonable certainty. If remote,

speculative, contingent or uncertain, they are not recoverable.'' (191 Va., at page 573, 62 S. E. 2d, at page 255.)

The Kentucky court follows this general rule. *American Bridge Co.* v. *Glenmore Distilleries Co., supra* (107 S. W., at page 284); *Kentucky Heating Co.* v. *Hood, supra* (118 S. W., at page 338).

In our opinion the evidence adduced on behalf of the plaintiff with respect to Item No. 6 does not measure up to these requirements. We are not here concerned with the disruption of a business relationship involving numerous transactions with numerous customers, where the volume of future business may be estimated with reasonable certainty. On the contrary, the plaintiff had established a relationship with what was in effect a single customer, involving a relatively small number of transactions. Unlike the preceding five items of the plaintiff's damages, there is no evidence that these coal companies had promised the plaintiff any further work, or that they had definitely decided upon an additional construction program. Whether such construction work would have been undertaken by these companies, and if so, the extent thereof and what part thereof, if any, would have been awarded to the plaintiff and upon what terms, is entirely speculative and conjectural. Evidence that the plaintiff during the past preceding two years had done work for these companies at an annual profit of $25,000, standing alone, will not, we think, support a finding, as the plaintiff argues, that this situation would have continued over a period of years. In short, the plaintiff's evidence fails to establish the amount and extent of its damage under this item with the required reasonable certainty.

In Item No. 7 the plaintiff claimed $100,000 as damages to its business reputation. The record is devoid of any evidence that the plaintiff's business reputation was in any way damaged by reason of the alleged wrongful acts of the defendants. The argument on behalf of the plaintiff is that ''the mere fact that the defendant unions wrongfully ran Laburnum out of Kentucky,'' thereby causing these coal-producing companies to cancel their contracts with the plaintiff, ''necessarily damaged'' the plaintiff's business reputation in the coal fields of West Virginia and Kentucky and throughout the United States. If such were the result of the defendants' wrongful conduct it was easily

susceptible of proof, and yet admittedly there is no evidence in the record to this effect.

The plaintiff relies upon the statement in 15 Am. Jur., Damages, § 135, p. 544, that "In tort actions, injuries to the plaintiff's reputation, injuries to, or the loss of, commercial credit, and injuries to financial or business standing constitute proper elements of damages where they are the natural and proximate results of the defendant's wrongful acts. Thus, where an injury has been done to an established business, the damages therefor may include damages resulting from injury to credit and business standing." But this does not mean that proof of such damages is not necessary. Indeed, the text just quoted cites as authority, *Virtue* v. *Creamery Package Mfg. Co.*, 123 Minn. 17, 142 N. W. 930, L. R. A. 1915B, 1179, in which it was said: "Damages for injury to the plaintiff's business, its reputation, standing, and good will, may, *upon proper proof,* be recovered." (142 N. W., at page 940; emphasis added.) Nor does the holding in *Peshine* v. *Shepperson,* 17 Gratt. (58 Va.) 472, 94 Am. Dec. 468, dispense with the necessity of proof of such damages.

In 25 C. J. S., Damages, § 144, p. 788, it is said: "As noted in § 6 *supra,* a presumption of at least nominal damage follows from proof of a legal wrong. However, the amount and items of pecuniary damage are not presumed, but must be proved; and if there is no evidence as to the extent of the pecuniary loss there can be no recovery of substantial damages, at least where the elements of damage are such as to be susceptible of pecuniary admeasurement. The burden of proving the fact and amount of pecuniary damage is on the party asserting the damage, particularly in the case of damages which are uncertain or have not been admitted; * * *." See also, 15 Am. Jur., Damages, § 356, p. 795.

In the absence of proof of damage to the plaintiff's business reputation there is no basis for the allowance of an award under this item.

We are of opinion, then, that there is ample evidence to sustain an award of $29,326.09, based on the first five items of plaintiff's claim for compensatory damages, with the allowance of $166.90 under Item No. 2, instead of $319.67 as claimed. The evidence does not, in our opinion, sustain an award on account of Items Nos. 6 and 7 of the plaintiff's claim.

## Punitive Damages

Under the decisions of the Kentucky court, to justify an award of punitive damages for a tort there must be a showing of malice or willfullness, or a wanton disregard of the rights of others from which it may be assumed that the tort-feasor was acting either maliciously or willfully. *W. T. Sistrunk & Co.* v. *Meisenheimer*, 205 Ky. 254, 265 S. W. 467, 468. As expressed in *Great Atlantic & Pacific Tea Co.* v. *Smith*, 281 Ky. 583, 136 S. W. 2d 759, 768, punitive damages "are allowed where the tort is aggravated by evil motive, actual malice, or deliberate violence."

In *Engleman* v. *Caldwell & Jones*, 243 Ky. 23, 47 S. W. 2d 971, an award of punitive damages for the conduct of the defendant in persistently driving away trade from plaintiffs' store by derogatory and offensive remarks was upheld. The court there said: "The appellant's conduct and declarations were an invasion of appellees' rights (citing authorities), and not only aggravating and insulting but were engaged in by him in utter reckless disregard of the rights of the appellees to enjoy the peaceful pursuit of their own business." (47 S. W. 2d, at page 973.)

In *Anchor Co.* v. *Adams*, 139 Va. 388, 392, 124 S. E. 438, we held that the willful and unauthorized destruction of one's business is the ground for the imposition of punitive damages on the wrongdoer.

Tested by these principles we are of opinion that there was ample evidence to support the finding that the acts of the defendants' agents were done willfully and maliciously, and thus entitled the plaintiff to an award of punitive damages. According to the evidence of the plaintiff's witnesses, this was no peaceful labor dispute in which the agents of the defendants were merely attempting to organize or persuade a few unskilled laborers to join the union. On the contrary, there is ample evidence that it was the willful and avowed purpose of defendants' agents to prevent the plaintiff's employees from proceeding with their work unless these employees joined the United Construction Workers, one of the defendant unions, and that such purpose was evinced by words and conduct so violent and abusive as to put these employees in fear for their lives and safety. Yielding to these threats the plaintiff's employees refrained from continuing with their work, with the result that

the plaintiff's business relationship with its customers was disrupted and destroyed, to its considerable damage.

At the request of the plaintiff the jury were instructed that they might allow punitive damages if they believed from the evidence that the alleged wrongful acts of the defendants' agents were "committed in a manner so wanton or reckless as to manifest a willful disregard for the rights of others." At the request of the defendants the jury were told that if "Hart and the men associated with him on the occasions complained of acted solely for the purpose of enforcing their legal rights in a lawful manner, and not for the purpose of injuring the plaintiff, no exemplary or punitive damages" could be awarded. The jury's finding on the issue is, of course, binding on us.

■ We are not impressed with the argument that the award of $100,000, by way of punitive damages, was excessive. In Kentucky punitive damages "are given as compensation to the plaintiff and not solely as a punishment of the defendant." They must bear some relation to the "injury and the cause thereof" rather than to the amount of compensatory damages allowed.[2] *Louisville & N. R. Co.* v. *Ritchel,* 148 Ky. 701, 147 S. W. 411, 414, 41 L. R. A., N. S., 958, Anno. Cas. 1913E, 517.

The general rule is that there is no fixed standard for the measurement of exemplary or punitive damages, and the amount of the award is largely a matter within the discretion of the jury. 25 C. J. S., Damages, § 126, p. 737. In *Engleman* v. *Caldwell & Jones, supra,* the Kentucky court held that the jury may award punitive damages according to their conclusions from the entire evidence respecting the conduct and motives of the person inflicting the wanton injury. The award "may not be considered excessive" merely because in the estimation of the adverse party the amount is large. (47 S. W. 2d, at page 973.)

Under these principles the amount of punitive damages was, we think, within the discretion of the jury.

## PROCEDURAL MATTERS

By more than one hundred assignments of error the defendants challenge various rulings of the lower court during the progress of the trial. Some of these assignments are trivial and others are so vague and indefinite as not to merit discussion. Within the limits of an opinion of reasonable length, we may

---

[2] Compare *Stubbs* v. *Cowden,* 179 Va. 190, 18 S. E. 2d 275.

deal only with those assignments which relate to rulings of the trial court on crucial matters.

A number of the assignments challenge the rulings of the trial court on the admissibility of hearsay testimony. First, it is said, the court erred in permitting Bryan and others to testify as to declarations made by Laburnum employees that they would not return to work because the declarants were in fear of violence at the hands of defendants' agents.

It is well settled that evidence of such utterances is admissible to show the state of mind of the declarants. Wigmore on Evidence, 3d Ed., Vol. 6, §§ 1789, 1790, pp. 235-239; *Karnes* v. *Commonwealth,* 125 Va. 758, 764-765, 99 S. E. 562, 4 A. L. R. 1509; *Parsons* v. *Commonwealth,* 138 Va. 764, 777-782, 121 S. E. 68; *Goodloe* v. *Smith,* 158 Va. 571, 582-584, 164 S. E. 379. Such evidence was relevant to show that fear of the consequences was the compelling reason why plaintiff's employees quit their work.

Secondly, the defendants complain of the admission of evidence of the declarations of certain representatives of the American Federation of Labor, which tended to show that the representatives of the rival union were cognizant of the situation which had been brought about by the acts of the defendants' agents and that it was dangerous for the Laburnum employees who were members of the declarants' union to return to work.

While the evidence of the mental attitude of these representatives was somewhat remote, it tended to corroborate the plaintiff's other evidence of the tense situation which pervaded the neighborhood and had caused the Laburnum employees to refuse to return to work. As is indicated in *Karnes* v. *Commonwealth, supra,* the modern trend is toward liberalization of the rules of evidence in order that the jury may be fully enlightened as to all the surrounding facts and circumstances.

Moreover, each of the declarants took the stand and testified as to the incidents. Consequently, admitting evidence of their declarations with respect to these incidents, if error, was harmless.

The admissibility of the evidence of the reputation of Breathitt county, Kentucky, the site of the plaintiff's work and of the disturbance, for unrestrained lawlessness is governed by the same principle. It was corroborative of evidence on behalf

of the plaintiff that there was real cause for its employees being afraid to return to their work.

Error is assigned to the action of the trial court in permitting Frank Dixon, a representative of the Carpenters and Joiners Union, an affiliate of the American Federation of Labor, to testify that he received "in a round-about way" a message from Thomas E. Raney, a representative of the United Mine Workers of America, after the present case was set for trial, that Raney wanted to meet him and work out a settlement to keep the members of the American Federation of Labor affiliate from testifying. Upon being asked by the court what he meant by "round-about way," Dixon replied that he was refraining from disclosing the name of his informant because he (Dixon) feared that his doing so might bring bodily harm to that person.

In the absence of the jury counsel for the defendants were given the privilege of asking Dixon to name his informant and they declined to do so. In this situation they are hardly in a position to complain that the name of the informant should have been developed by counsel for the plaintiff rather than by themselves.

Moreover, later Raney took the stand and flatly denied that he had sent such message to Dixon, or that he had ever heard "of such person." We find no prejudicial error in the ruling of the trial court with respect to this incident.

██ In preparation of its case the plaintiff propounded to the defendants a number of interrogatories, the main purpose of which was to show the relation between the three union defendants. At the trial the plaintiff offered in evidence all of the interrogatories and answers with the exhibits thereto attached, and was allowed to read to the jury such questions, answers and exhibits as counsel deemed pertinent and the court ruled to be admissible. The defendants were then given the privilege of reading to the jury any remaining questions and answers which their counsel deemed pertinent.

The defendants objected to this procedure, claiming that under a proper interpretation of the statute (Code, § 8-322)[3] all of the questions, answers and exhibits should have been read *in extenso* to the jury by counsel for the plaintiff when they

---

[3] "§ 8-322. *Use of such answers.* Answers to such interrogatories may be used as evidence at the trial of the cause, in the same manner and with the same effect as if obtained upon a bill of discovery."

were offered in evidence. In support of this contention they cite *M'Farland* v. *Hunter,* 8 Leigh (35 Va.) 489, 497, which holds that under the statute the whole of the answers to interrogatories, like the answer to a bill of discovery, must be read. Properly interpreted, this holding means nothing more than that the opponent whose answer is introduced in evidence has the right "to have the whole, or none, laid before the court." Wigmore on Evidence, 3d Ed., Vol. 7, § 2121, p. 542. That was done when the whole of the interrogatories and answers were put in evidence. When the court permitted counsel for the plaintiff to read to the jury such portion of the lengthy interrogatories and answers as they deemed pertinent, and offered counsel for the defendants the same opportunity, obviously the rights of the defendants were fully protected.

On February 13, 1951, the Richmond News Leader, a newspaper published in the city of Richmond, where the trial was then in progress, published an editorial entitled "Enemies of the Miner?" The purport of this editorial was that John L. Lewis, the head of the United Mine Workers of America, one of the defendant unions, in notifying the members of the union of an increase in their daily wages, had told them that each would be assessed the sum of $20 a year to create a fund to defend "expensive litigation" which the "enemies of the union" had instituted or were contemplating instituting against it. The editorial deplored the fact that although "Mr. Lewis' language has the ring of a Politburo voice denouncing the 'enemies of democracy,' " no one had been "heard to protest" against it.

On the day following publication of the editorial, and while the court was considering the instructions, counsel for the defendants moved for a mistrial because of the editorial, claiming that it was inflammatory and highly prejudicial to the interests of the defendants. The attention of the court was directed to the fact that the publisher of the newspaper was a relative of A. Hamilton Bryan, the president of Laburnum. While Bryan admitted his relationship with the publisher of the paper, and the fact that he owned "a small minority stock interest" in the corporation which published the paper, he testified that he was in no way responsible for the editorial and had nothing whatsoever to do with its publication. This testimony is uncontradicted.

Inasmuch as the court had instructed the jury not to read

"any newspaper articles about this case during the trial," it overruled the motion for a mistrial. However, it then and there offered to poll the jury to ascertain whether or not any of them had read the editorial and whether they might be influenced thereby. This offer was declined by counsel for defendants. Immediately after the verdict was announced the defendants requested the court's permission to poll the jury to determine whether any of them had read the editorial. The motion was overruled.

Error is now assigned to the action of the trial court in declining to grant a mistrial before the verdict and in overruling the defendants' request after the verdict that they be allowed to poll the jury.

Assuming that those responsible for the publication of the editorial knew that the present case was being tried and the issues it involved, the publication was reprehensible, for it might have prejudiced the rights of the United Mine Workers of America, one of the defendants, and necessitated a new trial at great expense to the parties. But in the absence of a showing that any of the members of the jury read the article, or were influenced thereby, and in view of the fact that counsel for the defendants were afforded and declined the opportunity extended them by the court before the verdict to ascertain whether this was so, there was no error in overruling the motion for a mistrial.

Having declined and waived the privilege of having the jury polled before the verdict, the defendants cannot now be heard to complain of the court's action in not permitting a poll after the verdict.

We cannot undertake to review in detail the numerous assignments of error leveled at the rulings of the trial court on granting and refusing the instructions. Suffice it to say, that after a careful consideration of these rulings we find no prejudicial error in any of them, save the submission to the jury of the issue of the plaintiff's right to an award based on Items Nos. 6 and 7 of its claim for damages. There was, as we have said, insufficient evidence to go to the jury on either of these issues.

It is, of course, unnecessary that we discuss the assignments of error with respect to the admissibility of evidence relating to Items Nos. 6 and 7 of the plaintiff's claim for damages.

We find no reversible error in any of the remaining assignments of error.

On the whole our conclusion is that the award of compensatory damages of $29,326.09, and punitive damages of $100,000, or a total of $129,326.09, is fully supported by the law and the evidence. The additional award of $146,111.10[4] for compensatory damages is not supported by the evidence.

Section 90 of the Constitution, as amended in 1928, provides in part that this court "may, but need not, remand a case for a new trial. In any civil case, it may enter final judgment, except that judgment for unliquidated damages shall not be increased or diminished."

The plain purpose of the provision is to leave to the fact-finding tribunal—the jury or the trial court sitting as a jury—the function of fixing the amount of unliquidated damages. It does not deprive this court of the authority to remand the case to the lower court with direction that the plaintiff be put upon terms to remit a portion of an award for unliquidated damages or else submit to a new trial. *Bishop* v. *Webster,* 154 Va: 771, 787, 153 S. E. 832, 155 S. E. 828. Nor does it, in our opinion, divest this court of the well-recognized power to modify a judgment of the lower court in an action for unliquidated damages by eliminating such excess as is clearly attributable to the consideration of improper items, provided this court can determine and segregate the excess from the allowable portion of the award. 3 Am. Jur., Appeal and Error, § 1174, pp. 683-684; *Id.,* § 1177, pp. 686-687; *Clinchfield Coal Corp.* v. *Couch,* 127 Va. 634, 639, 104 S. E. 802, 13 A. L. R. 398 (decided prior to the adoption of the amendment). Here the excess in the amount of compensatory damages is clearly attributable to the improper consideration of Items Nos. 6 and 7 of the plaintiff's claim.

Accordingly, under the authority of Code, § 8-493, we shall modify the judgment under review by striking therefrom the sum of $146,111.10 and affirm the balance of the judgment for the sum of $129,326.09, with interest thereon from February 16, 1951, the date of the verdict. Having substantially prevailed on this appeal the plaintiff will recover its costs here.

*Modified and affirmed.*

---

[4] Allowable compensatory damages........................... $ 29,326.09
Allowable punitive damages..................................... 100,000.00
Excess not allowable................................................. 146,111.10

Total award under the verdict................................ $275,437.19