## Richmond

## SERVICE STEEL ERECTORS COMPANY
### v.
## INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 147, 147A, 147B AND 147R

August 31, 1978.

Record No. 770261.

Present: Carrico, Harrison, Cochran, Harman, Poff and Compton, JJ.

John O'Brion, Jr. (R. Hunter Manson, Paul S. Bliley, Jr.; Browder, Russell, Little, Morris & Butcher, on brief) for plaintiff in error.

Stuart R. Gordon (Henry E. Howell, Jr.; Howell, Anninos, Daugherty and Brown, on brief) for defendant in error.

COCHRAN, J., delivered the opinion of the Court.

Service Steel Erectors Company (Service Steel) initiated this action in the court below to recover damages from International Union of Operating Engineers, Local 147, 147A, 147B and 147R (the Local) for an alleged breach of a no-strike provi sion in a collective bargaining agreement.[1] Specifically, the motion for judgment alleged that the Local had breached its agreement to furnish operating engineers for a designated project. At the conclusion of Service Steel's evidence, the trial court sustained the Local's motion to strike the evidence and entered summary judgment in its favor. On appeal, the questions presented by Service Steel are whether the trial court erred in ruling that there was insufficient evidence to raise a jury issue as to liability and in ruling that certain evidence proffered by Service Steel was inadmissible.

Virginia Association of Contractors, Inc., on behalf of certain named contractors, includdng Service Steel, had entered into an agreement dated June 20, 1975, with the Local which contained the following provision:

## "ARTICLE XXI - SETTLEMENT OF DISPUTES

---

[1] Although Section 301(a) of the Labor Management Relations Act of 1947 (29 U.S.C. 185 (a)) confers jurisdiction upon federal district courts over collective bargaining contract disputes, this statute did not divest state courts of concurrent jurisdiction over such controversies. *Charles Dowd Box Co.* v. *Courtney,* 368 U.S. 502 (1962); *see also William E. Arnold Co.* v. *Carpenters District Council,* 417 U.S. 12 (1974).

"There shall be no work stoppages, strikes or lockouts during the terms of this Agreement for any reason whatsoever."

\* \* \*

In July 1975, while the agreement was in effect, Service Steel was a subcontractor of Morris-Knudsen Co. (Morris-Knudsen), a general contractor engaged in constructing the island approaches and vent buildings for the second Hampton Roads Bridge-Tunnel between Hampton and Norfolk. A separate contract had been let for construction of the tunnel ("tube") portion of the project, and neither Service Steel nor Morris-Knudsen had any contractual obligation as to that work.

On July 7, 1975, members of a sheet metal workers union established a picket line to protest certain awards of work on the "tube" contract by a contractor known as Lockwood Brothers. Members of the Local, however, ignored this picket line and reported to work. On July 10, Gordon Walters, a member of the Local employed by Service Steel as a heavy equipment operator, arrived at the job site on the northern (Hampton) end of the project and began operating a 15-ton "cherry picker" crane used to move steel girders from storage areas into the place where they were to be installed. Emmanuel ("Pee Wee") Evans, the Local's steward for the Morris-Knudsen job, came to the Service Steel job site, conversed briefly with Walters, and departed. Parking his equipment, Walters went to the work trailer of Service Steel, and, after trying unsuccessfully to talk by telephone with Russell Moore, the Local's Business Agent, left the job to wait on a bridge just outside the picket line.

On the same morning, the ten or twleve members of the Local who were employed by Morris-Knudsen also refused to cross the picket line. A. D. Poteat, Project Manager for Morris-Knudsen, read the provisions of Article XXI of the collective bargaining agreement to Evans, who denied knowledge of the agreement and said, "I will not cross a picket line".

All members of the Local remained off work from July 10 through July 16. Repeated attempts made by Walters, Service Steel, and Morris-Knudsen to communicate with Moore by telephone were unsuccessful. Moore apparently was unavailable, and

he never returned the telephone calls. During the work stoppage no official of the Local came to the job site, and no members of the Local worked for Service Steel or Morris-Knudsen. Although he did not cross the picket line, Walters reported to work each morning and attempted, without success, to reach the Business Agent by telephone. Service Steel attempted to replace Walters but could not persuade a non-union equipment operator to cross the picket line.

Service Steel introduced into evidence a telegram dated July 14, 1975, from the International Union of Operating Engineers, in Washington, D. C., to the Local's Business Agent, Moore, in Norfolk, directing him to return the men to work and informing him that a "second gate" had been established to make it unnecessary for union members to cross a picket line. On July 17, Walters and the members of the Local employed by Morris-Knudsen returned to work, although the picket line was still being maintained by the sheet metal workers.

During the trial, the testimony of Michael Joseph Jernigan and of Warren Jessup, Vice President and foreman, respectively, of Service Steel, as to certain statements made by Walters concerning the work stoppage was, upon objection, excluded on the ground that this constituted inadmissible hearsay evidence. However, Jernigan testified, without objection, to the following statement made by Walters after Jernigan had informed him that the picket line had not been established by the Local to which Walters belonged:

> "He told me he had been informed it was a legal picket being honored by his union. He had been told that by the steward. Charges could either be brought up against him, he could be fined for that or he could never get another job out of that Local."

The trial court, finding that there was no "competent evidence that the defendant here stopped the work or called a strike", sustained the Local's motion to strike Service Steel's evidence.

In considering a motion to strike a plaintiff's evidence, the trial court should resolve any reasonable doubt in favor of the

plaintiff. *Williams* v. *Vaughan,* 214 Va. 307, 309, 199 S.E. 2d 515, 517 (1973). Service Steel, therefore, was entitled to have all reasonable inferences drawn in its favor.

■ There was no evidence that the Local took official action by formal vote recorded in the minutes of its meetings to effect a work stoppage by acknowledging the legitimacy of the picket line established by the sheet metal workers or by calling a strike. But the lack of such evidence does not necessarily resolve the issue. In view of the contractual obligation assumed by the Local in the no-strike clause of the agreement, it is unlikely that any records of the Local would reveal an intent to violate the contract by inducing a walkout by its members. Nevertheless, if it could reasonably be inferred from the direct and circumstantial evidence adduced by Service Steel that the Local instigated, encouraged, authorized, or prolonged the work stoppage, then a jury issue was created. We believe that such an inference could reasonably be drawn.

A jury might conclude, of course, that it was sheer coincidence that Walters left his job after being visited by Evans, that all Local members decided to respect the picket line at the same time, and that all Local members returned to work simultaneously. A reasonable inference that could be drawn from this evidence, however, is that the disruption was an activity inspired or encouraged by the Local, rather than a spontaneous, illegal, "wildcat" strike initiated by individual members acting independently, particularly in view of the attitude of the Local's job steward when Poteat read him the no-strike provision in the agreement, the failure of any official of the Local to appear at the job site during the work stoppage, and the termination of the work stoppage after the International Union sent its telegram to the Local's Business Agent. Thus, there was at least circumstantial evidence tending to prove action by the Local. There was evidence that Evans was an agent of the Local, and there was no evidence that his actions exceeded the scope of his authority.

■ There was also evidence of mass action by members of the Local. True, the mass was not a large one, being only the ten or twelve members employed by Morris-Knudsen, and Walters, employed by Service Steel, but it comprised the entire work force

supplied by the Local to these two employers. No other equipment operators were supplied to them by the Local during the work stoppage.

Where mass action of union members occurs, the union may not avoid responsibility on the ground that the proscribed action was not officially initiated or sanctioned by agents acting within the scope of their authority. It is well established that a union is responsible for the mass action of its members as long as it is functioning as a union. *Wagner Electric Corp.* v. *Local 1104, Int. U. of E., R. & M.W.*, 496 F.2d 954, 956 (8th Cir. 1974); *Vulcan Materials Co.* v. *United Steelworkers of America*, 430 F.2d 446, 455 (5th Cir. 1970), *cert. denied, 401 U.S. 963 (1971); International Union, etc.* v. *United States*, 177 F.2d 29 (D.C. Cir. 1949), *cert. denied*, 338 U.S. 871 (1949). The premise for this rule is that "large groups of men do not act collectively without leadership and that a functioning union must be held responsible for the mass action of its members." *Eazor Exp., Inc.* v. *International Bro. of Team., Etc.*, 520 F.2d 951, 963 (3d Cir. 1975), *cert. denied*, 424 U.S. 935, *reh. denied*, 425 U.S. 908 (1976). A union is an association of members that differs in its composition from a corporation which is an entity separate and distinct from its stockholders. Therefore, union participation may be implied from the mass action of its members.

There is no merit in the Local's argument before us that it was insulated from liability because the work stoppage was the result of a supervening, independent cause, namely, the establishment of a picket line by third parties. The no-strike provision was absolute, not qualified or conditional, and it prohibited work stoppages whatever their cause.

Moreover, there was evidence from which it could be reasonably inferred that the Local failed to use its best efforts to return the men to work. Evans, the Local's steward on the Morris-Knudsen job, professed ignorance of the no-stike provision in the collective bargaining agreement when the employer's Project Manager read it to him. He then made known his intention of violating the agreement by refusing to cross the picket line, and he never returned to the work site during the work stoppage. Moore's passive conduct was no less uncooperative. Although Poteat, a union member himself, characterized Moore, in his capacity as

Business Agent, as being the person in "complete control" of the Local, Moore was never available while repeated efforts were being made to find him during this period of serious disruption in the contractual relations between the employers and the Local. Walters telephoned every day, Jernigan called frequently, and Poteat tried seven times without success before finally reaching him by telephone on the same day the International Union sent the telegram ordering him to get the men back on their jobs. A jury might reasonably infer that Moore was deliberately evading Walters and the employers in order to avoid any responsibility for bringing the work stoppage to an end.

▪ A no-strike provison in a collective bargaining agreement implies an obligation on the part of the union to use all reasonable means to terminate an unlawful strike and return striking members to their jobs if it is not to be held responsible for their actions. *Eazor Exp., Inc.* v. *International Bros. of Team., Etc., supra,* 520 F.2d at 959-60; *Penn Pack. Co., Inc.* v. *Amalgamated Meat Cutters, Local 195,* 497 F.2d 888, 891 (3d Cir. 1974); *Wagner Electric Corp.* v. *Local 1104, Int. U. of E., R. & M.W., supra,* 496 F.2d at 956; *Vulcan Materials Co.* v. *United Steelworkers of American, supra,* 430 F.2d at 457; *Adley Express Co.* v. *Highway Truck Driv. & H., Local No. 107,* 349 F. Supp. 436, 444 (E.D. Pa. 1972). Obviously, a no-strike agreement could be rendered meaningless if a union could with impunity indicate tacit approval of a work stoppage by failing to take affirmative action to keep its members on the job.

In the present case, there was evidence from which it reasonably could be inferred that (1) Evans was an active instigator of the walkout, (2) that there was mass action by all the affected members of the Local, and (3) that the Local failed to exert reasonable efforts to terminate the strike or to supply replacement operators. Indeed, supporting this third inference, there was evidence of far more than mere indifference or complacency on the part of the Local to the continuation of the work stoppage, although passive acquiescence or voluntary neutrality would suffice to constitute a violation of the Local's implied obligation to act with reasonable diligence to terminate a breach of the bargaining agreement. We hold, therefore, in light of the inferences that could reasonably be drawn from the evidence, that the trial court

committed reversible error in striking the evidence of Service Steel and entering summary judgment in favor of the Local.

As the case must be remanded for a new trial, we turn our attention to the challenged rulings of the trial court excluding all of the following hearsay evidence.

 Jernigan was asked on direct examination about a statement made to him by Walters after leaving the job. Jernigan's answer was that Walters had said that Evans, the Local's job steward, had told him that the picket line was legal and would be honored by the equipment operators. The witness was then asked what reason Walters gave for not returning to work, and answered in effect that Walters was afraid of economic reprisal by the Local.[2] When asked whether Walters gave any reason for returning to work, Jernigan replied that Walters had been told to come back to the job.

Jessup was asked on direct examination about a statement made by Walters explaining why he was not working. Jessup replied that Walters stated that Evans had informed him that there was a picket line and it would be to his interest to stay beyond it. He was then asked whether Walters gave any reason for remaining off the job, and answered that he would not cross the picket line without approval from Moore.[3] Asked whether Walters gave any reason for returning to work on July 17, Jessup replied that Walters said he had been notified to do so.

Service Steel, relying on *United Constr. Wkrs.* v. *Laburnum*, 194 Va. 872, 75 S.E.2d 694 (1953), contends that all the foregoing

---

[2] "Q. Can you tell me what reason he gave if any as to why he was not returning to work?

"A. Well, he had never been threatened, or anyway I don't want it to sound like he had been. He was afraid — well, he told me he was afraid charges might be brought up, if it was a legal picket, against him which would cost him money or he might not ever be able to get another job out of the Local."

[3] "Q. Did he give you any reason as to why he was not going back to work?

"A. Well, he said he wouldn't cross the picket without authorization from his Business Agent. He had tried to contact him and was not able to reach him. He said he called during the day up until 11:30 at night and was not able to reach him."

excluded testimony was admissible as an exception to the hearsay evidence rule to show Walter's state of mind. In *Laburnum*, we held that testimony as to declarations made by employees that they would not return to work because of fear of violence at the hands of the defendant union's agents was admissible to show the state of mind of the declarants. Such evidence was relevant, we said, to show that fear of union violence was the compelling reason why the employees left their jobs. *Id.* at 896, 75 S.E.2d at 709-710. *See also Elmer* v. *Fessenden*, 151 Mass. 359, 24 N.E. 208 (1890).

Applying this rationale to the testimony proffered in the present case, we conclude that the questions and answers set forth in footnotes 2 and 3, *supra,* were admissible under the exception to the hearsay rule to show that fear of the Local's retaliatory sanctions was the compelling reason why Walters refused to work. These statements, which tended to prove his state of mind, were not unduly prejudicial to the Local because they did not evidence specific acts of the Local. Nevertheless, the Local would have been entitled to an instruction cautioning the jury to receive the evidence solely for the purpose of proving state of mind. *See Adkins* v. *Brett,* 184 Cal. 252, 193 P. 251 (1920); *McCormick on Evidence,* § 294, p. 696 (2d ed. 1972).

We find no error in the rulings of the trial court insofar as they excluded the other portions of the proffered testimony of Jernigan and Jessup. Such testimony was double hearsay and thus doubly suspect. *See McCormick on Evidence, op. cit. supra,* § 246, pp. 585-86. In each instance, the witness was testifying to what Walters had declared were statements made to him by a third party. And, in each instance, it is apparent that the dominant purpose in offering the evidence was to show involvement of the Local, *i.e.,* the truth of the facts asserted, rather than Walter's state of mind. Such declarations, offered as equivalent to testimony of a witness wthout the safeguard of available cross-examination, were properly rejected.

For the reasons assigned, we will reverse the final judgment of the trial court and remand the case for a new trial consistent with the views herein expressed.

*Reversed and remanded.*